[No. S004638, Crim. No. 23859. Sept. 1, 1988.]

THE PEOPLE, Plaintiff and Respondent, v.
ELBERT LEE EASLEY, Defendant and Appellant.

[No. S004094. Sept 1, 1988.]

In re ELBERT LEE EASLEY on Habeas Corpus.

714

## COUNSEL

Alex Reisman, under appointment by the Supreme Court, and Charles F. Bourdon for Defendant and Appellant and Petitioner.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, John H. Sugiyama, Assistant Attorney General, Dane R. Gillette, Martin S. Kaye and Gerald A. Engler, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**LUCAS, C. J.**—Defendant appeals from a death judgment after a jury trial. This appeal under the 1977 death penalty law is automatic. (Pen. Code, § 1239, subd. (b).)[1]

At a prior trial, defendant was convicted and sentenced to death for the first degree murders of Reiner and Sigrid Junghans. The jury found as special circumstances (i) the murders were intentional and carried out pursuant to an agreement to accept valuable consideration from a person other than the victims (former § 190.2, subd. (a)), and (ii) defendant was convicted of more than one offense of murder (former § 190.2, subd. (c)(5)). On appeal, we affirmed the judgment as to guilt and special circumstances, but reversed the penalty because, inter alia, the jury had been instructed at the penalty phase not to consider sympathy for defendant. (*People* v. *Easley* (1983) 34 Cal.3d 858 [196 Cal.Rptr. 309, 671 P.2d 813].)

The penalty retrial was held in 1984, and defendant was again sentenced to death. In addition to this appeal, defendant has filed a petition for a writ of habeas corpus based on the claim (also made in his appeal) that he was ineffectively represented by trial counsel. We issued an order to show cause, and consolidated the writ matter with the appeal. We must reverse the penalty judgment because defendant's counsel was subject to a conflict of

---

[1] Unless otherwise indicated, all statutory references are to the Penal Code.

interest that adversely affected his performance, thus depriving defendant of effective assistance of counsel.

## I. Penalty Phase Facts

The evidence presented at defendant's first trial is set out in our prior opinion. (*Easley, supra,* 34 Cal.3d at pp. 864-867.) Much of the same evidence was presented again at the penalty retrial. For purposes of this appeal, we summarize that evidence as follows:

### A. *The Capital Crimes—Murders of the Junghanses*

In 1978, Reiner Junghans and Joseph Penka, both of whom owned stock in a corporation, had a falling out. Penka, frustrated by his attempts to wrest control of the corporation from Junghans, told two former employees that Junghans "is going to get his one way or the other." The two former employees, Raymond Smith and Donald Davis, later contacted Penka and arranged with him to kill Junghans for a price. Smith and Davis eventually contacted Ronnie Westmoreland, defendant's brother-in-law, who in turn agreed to arrange for defendant to do the killing.

The bodies of Reiner and Sigrid Junghans were found October 16; evidence suggested that they had been murdered the night of October 14. Baling wire was found on or near the two bodies, a rubber ball was in Sigrid's mouth and another was found near Reiner's body. Both had suffered repeated stabs with a weapon similar to an ice pick; Reiner had died from the stab wounds, whereas Sigrid died from a combination of the stab wounds and suffocation caused by the rubber ball. A note with defendant's fingerprint on it was discovered near the bodies, and a shotgun with the fingerprint of one Kenneth Davis was found in the Junghanses' house.

Smith, Donald Davis, Westmoreland and Lorrie Ross (defendant's girlfriend) testified that before the Junghanses' murders, defendant: obtained some baling wire and cut some of it with clippers later identified as his; acquired a gun from Donald Davis, who had in turn bought it from his brother, Kenneth Davis; was driven past the Junghanses' house by Westmoreland; and, with Westmoreland, purchased an ice pick and two rubber balls. On October 14, 1978, defendant telephoned Westmoreland and told him the murders were completed.[2] Thereafter, Penka gave $5,000 in $20 bills to Donald Davis. Davis delivered the money to Westmoreland, who in turn paid $4,000 of it to defendant. Defendant, who had been so short of

---

[2] There was no agreement for the murder of Sigrid Junghans; she apparently was killed because she was at home when defendant arrived to kill her husband.

cash the day before the murders that he had pawned a tool for $30, in the days after the murders repaid some debts and otherwise spent several thousand dollars in cash, all in $20 bills.

### B. *Additional Penalty Phase Evidence—The Arson for Hire*

At defendant's first penalty trial, and again at the penalty retrial, the prosecution introduced aggravating evidence of defendant's prior criminal activity under former section 190.3, factor (b). The evidence concerned defendant's involvement in an arson for hire of the Chicken Ranch brothel in Nevada. As described in our former opinion, the evidence "included a telegram containing the message, 'You have a job over here' sent to defendant by Bill Martin [owner of a Nevada brothel], together with a $50 money order. There was evidence tending to show that defendant had been in Nevada, staying with Bill Martin, in June 1978. Further evidence indicated that Martin . . . was engaged in a conspiracy with others either to extort money from [Walter Plankington,] the owner of the Chicken Ranch or to close [that brothel].

"An employee of the Chicken Ranch brothel testified that on the night of June 10, 1978, a man ran into the brothel and threw something inside. The building immediately burst into flames. . . . The employee first testified that she had not seen the man's face and could not identify him, but subsequently testified the man had a long nose and resembled defendant.

"Ross testified that defendant left for Las Vegas in April or May of 1978. Meeting again with her in late May or June in a motel in Fresno, he showed her approximately $700, and said he had 'burnt down a whorehouse' called 'the Chicken Ranch.'" (*Easley, supra,* 34 Cal.3d at p. 868.)

Substantially the same evidence as to the arson was presented at defendant's second penalty trial. At the second trial, as at the first, Plankington was called to testify for the prosecution, and he gave important prosecution testimony linking defendant to Martin. He testified he saw Martin with someone whom he "believed" was defendant at a Nevada bar in late May or early June 1978.[3]

---

[3]Plankington's initial testimony on this point was somewhat equivocal. The prosecutor asked Plankington on direct examination whether, when he saw Martin in the bar, another person was with Martin. Plankington responded: "Yes, there was a gentleman sitting on the right of Mr. Martin . . . . It appeared to me to be the defendant Mr. Easley . . . . [Question:] You say it appeared to be Mr. Easley. Aren't you certain it was Mr. Easley? [Answer:] I—sometimes I recall a Mr. Tatum who had a lot of features that Mr. Easley did who was also there, and—but I was—I was reasonably sure, yes, reasonably sure it was Mr. Easley." In response to further questioning by the prosecutor, Plankington stated that he had previously testified about this encounter, and at that time had stated that he was "firm" that the

Additional events arising from the arson had, however, transpired between the first and second trials. Because these events are relevant to defendant's argument that he was denied effective assistance of counsel, they are discussed in more detail in section II.A. below.

## C. Defense Evidence

Defendant attempted to cast doubt on his responsibility for the Junghanses' murders. Charleen Westmoreland Vallot, defendant's sister (who at the time of the murders was married to Ronnie Westmoreland), gave testimony suggesting that Westmoreland was involved in the actual killing of the Junghanses. The defense also attacked the evidence showing that defendant's wire clippers cut the wire found on or near the Junghanses' bodies; impeached and otherwise questioned Ross's testimony, based on prior inconsistent statements and on the fact that she received a cash reward in connection with her testimony; and introduced inconsistent statements by the several witnesses who had testified that defendant had paid bills and purchased items immediately after the murders, using $20 bills.

The defense also introduced witnesses who testified that defendant was under emotional stress at the time of the murders. Defendant's wife had been murdered while he was in prison on charges unrelated to the Junghanses' murders. After defendant was released from prison, he made a home with his children, but shortly thereafter, one child was murdered by an acquaintance with whom defendant had left the children. Defendant was adversely affected by these events; he suffered depression and strain.

Testimony given at defendant's first trial by his mother, who had since died, was read into the record. In addition, the defense presented the testimony of two psychiatrists. Dr. Lewis Nuernberger had worked as a psychiatrist at San Quentin Prison, and met defendant there. Nuernberger spent significant time interviewing defendant and believed that defendant underwent a severe mental disturbance about the time of the Junghanses' murders. Nuernberger identified two key events in defendant's adult life —specifically the murders of his wife and daughter—that he felt contributed to defendant's mental problems. Nuernberger noted that defendant had been hospitalized for psychiatric problems in 1971 or 1972. The doctor concluded that at the time of the Junghanses' murders, defendant had a mental disorder that affected his free will, and was therefore vulnerable to becoming involved in a murder plot. Dr. George Kellogg, also a psychiatrist,

---

other man sitting with Martin was defendant. In response to the prosecutor's question "As you sit there today, what is your feeling?" Plankington stated: "I believe it was Mr. Easley."

On cross-examination, Plankington's identification became more resolute. He stated he was "sure," and "awful sure," that he had seen defendant with Martin.

testified that defendant suffered from manic-depressive psychosis, organic brain damage, an organic affective disorder and a dissocial personality disorder. Like Nuernberger, Kellogg testified that defendant's disorders could have caused him to be susceptible to the influence of others and that the death of his daughter had been a major contributor to stress in his life.

## II. Discussion

### A. Ineffective Assistance of Counsel Based on Representation of Another Client With Conflicting Interest

■ Defendant contends he was deprived of effective assistance of counsel because, at the time of the penalty retrial, his attorney (Roger Hanson) simultaneously represented Walter Plankington, whose interests conflicted with those of defendant. As noted above, the principal penalty phase evidence introduced in aggravation consisted of allegations that defendant had committed the violent crime of burning down the Chicken Ranch brothel for Martin. Plankington, owner of the Chicken Ranch, testified for the prosecution about defendant's involvement in the arson.

### 1. The Record on Appeal

The record discloses the following: At the time Hanson represented defendant at the second penalty trial, he simultaneously represented Plankington in a federal civil suit against Martin and others. In that suit, Hanson's complaint alleged (on behalf of Plankington) that defendant committed the Chicken Ranch arson.[4] Thus, at defendant's penalty retrial, Hanson had two irreconcilable obligations: on behalf of defendant, to negate any evidence suggesting that defendant had committed the Chicken Ranch arson; and on behalf of prosecution witness Plankington, to prove in the civil suit that defendant had committed the Chicken Ranch arson at Martin's direction.

At his first trial, defendant was represented by the Stanislaus County Public Defender.[5] At the penalty phase of that trial, evidence was introduced to support the prosecution's contention that defendant was involved in the Nevada arson. (Ante, pp. 718-719.) Plankington testified that about the date of the arson, he saw defendant in a bar with Bill Martin, the rival

---

[4] We take judicial notice of the civil complaint filed by Hanson on behalf of Plankington and others, and the certified copy of the docket sheet related to that action.

[5] At that trial, defendant successfully moved for a change of venue from Stanislaus County. The first and second trials were both held in Monterey County. The Stanislaus County District Attorney prosecuted both trials.

brothel owner. Defendant did not testify at the penalty phase of his first trial.

### a. December hearing

In December 1983, at the trial setting conference on defendant's second penalty trial, the public defender who had represented defendant in the first trial asserted he was unable to continue representation because he had a conflict. He explained that, during defendant's first penalty trial, he (the public defender) had been informed by Plankington that Plankington planned to retain counsel on defendant's behalf, or to pay $25,000 to Attorney Roger Hanson, for defendant's representation. In return, Plankington wanted defendant to testify in a then-pending federal criminal trial that he (defendant) committed the Chicken Ranch arson. Thereafter, the public defender was subpoenaed and testified at the federal criminal trial, concerning the above mentioned conversation with Plankington. Defendant and Plankington testified at the same trial.

The public defender explained that he believed his testimony at the intervening federal criminal trial had differed from Plankington's testimony at that trial. As a result, the public defender felt it was possible that he would be required to testify at defendant's second penalty trial, concerning Plankington's credibility. The public defender also stated there had been a total breakdown of the attorney-client relationship after the first trial.

Neither Hanson nor defendant, both of whom were present at the conference, disputed the facts recited by the public defender. Defendant stated he did not want the public defender to represent him, and that he wished Hanson to be his attorney in the penalty retrial. Hanson noted that he was familiar with the case, and would accept an appointment. On the basis of these representations, the court relieved the Stanislaus County Public Defender, but declined at that time to appoint Hanson, and instead appointed the Monterey County Public Defender.[6]

### b. January hearings

The appointment of counsel issue was again discussed in early January 1984, before a different judge. The first of these hearings was off the record,[7] and defendant was not present. Hanson stated that although he did not solicit appointment as counsel for defendant, he would accept such an

---

[6] See *ante,* footnote 5.

[7] The content of this discussion, and the April hearing discussed below, was later memorialized in a settled statement. (Cal. Rules of Court, rule 36(b).)

appointment. The Monterey County Public Defender noted that Hanson was familiar with the case and with defendant, because he had represented defendant in his appeal from the first judgment. In addition, the public defender suggested it would be a significant burden on his staff, and potentially a financial burden on the county, if his office were required to take defendant's case.

The prosecutor opposed Hanson's appointment, citing a possible conflict of interest. He disclosed that Hanson had (on Plankington's behalf—see *post,* fn. 9) elicited defendant's confession to the arson, and that the prosecution intended again to introduce evidence of defendant's involvement in the arson at the penalty trial. A conflict could arise, the prosecutor suggested, if defendant chose to take the stand during the penalty phase in order to deny involvement in the arson. The prosecutor stated that at that point Hanson might be called as a witness to impeach defendant's testimony.

Hanson did not contest these factual statements. Instead, he asserted the arson evidence was inadmissible because defendant had not been convicted of that crime.[8] In addition, he argued the confession was inadmissible because defendant had received full immunity in exchange for his testimony about the arson in the federal criminal proceedings.

Later that day a second hearing was held, and defendant was present. The public defender repeated his assertion that Hanson was most familiar with the case, and submitted defendant's declaration, asking that Hanson be appointed his counsel. The court asked defendant if he wanted Hanson to be his counsel, and defendant responded affirmatively. After asking Hanson to state his qualifications, the court appointed Hanson defendant's counsel.

Hanson then noted that the district attorney had suggested he (Hanson) might be called as a witness, but he asserted other witnesses could provide the same information. In addition, he reiterated his belief that defendant's testimony in the intervening federal criminal trial was protected from disclosure because defendant had been granted immunity for his testimony. The district attorney stated he did not necessarily intend to call Hanson as a witness. But, he noted, he had requested the transcripts from the federal criminal trial, and depending on what he learned from those transcripts his strategy might change. The parties then discussed how Hanson's name could be excluded from testimony heard by the jury. This exchange terminated when the trial court stated it thought any problem could be evaluated later, and resolved satisfactorily.

---

[8] Prior unadjudicated crimes evidence was and is admissible under California law. (Former § 190.3, factor (b); present § 190.3, factor (b).)

### c. *March hearing*

In March 1984, a hearing was held before the judge who eventually presided over the penalty phase retrial. The prosecutor and defendant were present, but Hanson was not. After discussing the status of the case, the prosecutor raised an issue so that "Mr. Easley [could] start thinking about it at this time," namely, the possible conflict Hanson had with respect to the matter. The prosecutor acquainted the judge with the background of the intervening federal criminal case, the fact that Hanson represented Plankington "and probably still does," and the fact that Hanson had elicited defendant's confession regarding his involvement with the arson.[9] The prosecutor noted that because of the last fact, Hanson would face a serious ethical and legal conflict if defendant were to testify and deny committing the arson.

The court and prosecutor told defendant that in the absence of his counsel he was not being asked for a statement on the issue. Defendant nevertheless stated: "What [the prosecutor] is saying is the same thing that he said before when Mr. Hanson was appointed to me. He didn't—he went over all of this, and he is saying this and that, and since Mr. Hanson isn't present, he's taking the opportunity—he's taking advantage of the opportunity to just say the same thing over. It's all been said."

### d. *April hearing*

In April 1984, a hearing was held on defendant's pretrial motions. (See *ante*, fn. 7.) The prosecutor reiterated that he felt Hanson's representation of defendant presented the possibility of a conflict of interest based on Hanson's representation of Plankington in connection with the federal civil suit, Hanson's role in obtaining defendant's confession to the arson, and the possibility that Hanson himself might be a witness about defendant's arson confession.[10] Hanson responded that evidence of defendant's confession

---

[9] The prosecutor told the court, "Mr. Hanson represented Mr. Plankington and probably still does. [¶] Mr. Plankington is the owner of the house of prostitution from Nevada and which the People alleged [defendant] burned down, by way of being hired to do so in the penalty phase, and we feel that may be a conflict, the fact that he represented him at one time. . . . [¶] Mr. Hanson also elicited a confession from [defendant] regarding his involvement in the arson, and the fact that he was an aider and abettor in that arson in Nevada." We take judicial notice of the fact that Hanson did indeed represent Plankington in his federal civil suit for damages incurred as a result of the arson, and that the suit was pending at the time of the penalty retrial. (*Ante,* fn. 4.)

[10] At both this and the previous hearings, the fact that Hanson had obtained defendant's confession to the arson was viewed as important only because it meant Hanson might be a witness should defendant testify and deny the arson. Other implications of Hanson's actions in connection with the confession and his representation of Plankington were never discussed.

should be barred, because defendant had been granted immunity in connection with his testimony. Hanson also noted another potential conflict, in that he had represented defendant's sister in a prior matter, in which Ronnie Westmoreland (then defendant's sister's husband, and a witness against defendant in the Junghanses' murder trial) had been a codefendant. Hanson stated, however, that he did not believe his prior representation of defendant's sister would affect his ability to cross-examine Westmoreland. The court then advised defendant that he had a right to counsel free of any potential conflict of interest and that such counsel would be appointed for him if he so desired. Defendant stated he wanted Hanson to represent him.

## 2. *The Habeas Corpus Petition*

As noted above, defendant filed a habeas corpus petition alleging facts outside the record which relate to the conflict between Hanson, Plankington and defendant. The petition consists essentially of Hanson's declaration under penalty of perjury, confirming the facts found in the record noted above, and certain additional facts. On receipt of the habeas corpus petition, we issued an order to show cause. In the People's return, certain facts set forth in the petition are admitted, including (i) Hanson's representation of Plankington in the civil suit and (ii) the fact that, in connection with his representation of Plankington, Hanson elicited defendant's confession to that arson. The People do not dispute the other facts in Hanson's declaration, but allege only that they cannot admit or deny the statements because of lack of information and belief. Because the key facts supporting defendant's claim are adequately established in the record on appeal, however, we need not rely on the additional facts adduced in the petition for habeas corpus.

## 3. *Analysis*

■ "In order to establish a violation of the Sixth Amendment, a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." (*Cuyler* v. *Sullivan* (1980) 446 U.S. 335, 348 [64 L.Ed.2d 333, 346-343 100 S.Ct. 1708]; accord, *Strickland* v. *Washington* (1984) 466 U.S. 668, 692 [80 L.Ed.2d 674, 696, 104 S.Ct. 2052].) The court in *Sullivan* made clear that such a defendant must "show[] that his counsel actively represented conflicting interests," and "the *possibility* of conflict is insufficient to impugn a criminal conviction." (446 U.S. at p. 350, italics added [64 L.Ed.2d at pp. 347, 348].)

### a. *Active representation of conflicting interests*

■ We conclude Hanson's simultaneous representation of Plankington and defendant resulted in active representation of competing interests.

Hanson represented Plankington in a federal civil case against Martin for damages resulting from the arson, in which liability for the arson was obviously at issue. For the purposes of that suit, Plankington needed to show Martin was responsible for the arson. To establish Martin's responsibility, Plankington alleged in his complaint (*ante,* fn. 4) that Martin directed defendant and others to commit the arson. In fact, it was so important to Plankington that it be shown defendant was involved in the crime (and that defendant was hired by Martin) that Plankington's lawyer, Hanson, obtained defendant's confession to involvement in the crime, in return for Plankington's payment for Hanson's services on defendant's appeal. At the same time, on defendant's behalf Hanson needed to raise doubt about defendant's involvement in the arson. The clearest type of conflict thus arose between Hanson's two clients: they had completely opposite interests concerning the same issue, and Hanson represented both simultaneously.

b. *Adverse effect on counsel's performance*

■ It is important to recognize that "adverse effect on counsel's performance" under *Sullivan, supra,* 446 U.S. at pages 348 and 350 [64 L.Ed.2d at pages 346, 348], is not the same as "prejudice" in the sense in which we often use that term. When, for example, we review a "traditional" claim of ineffective assistance of counsel (i.e., one involving asserted inadequate performance as opposed to "conflicted" performance), we require the defendant to show a reasonable probability that the *result* (i.e., the disposition) would have been different. (*Strickland, supra,* 466 U.S. at pp. 693-696 [80 L.Ed.2d at pp. 697-699]; *People* v. *Fosselman* (1983) 33 Cal.3d 572, 583-584 [189 Cal.Rptr. 855, 659 P.2d 1144].) This, however, is not the inquiry called for under *Sullivan.* (See *People* v. *Mrockzo* (1983) 35 Cal.3d 86, 104, fn. 16 [197 Cal.Rptr. 52, 672 P.2d 835] ["As a practical matter, the Supreme Court's formulation seems to envision an analysis of whether there has been some identifiable prejudice to the right of effective representation but not an analysis of whether that prejudice affected the outcome of the case."].) As we suggested in *Mrockzo, supra, Sullivan* requires an inquiry into whether the record shows that counsel "pulled his punches," i.e., failed to represent defendant as vigorously as he might have had there been no conflict. (See, e.g., *Burger* v. *Kemp* (1987) 483 U.S. 776, 787-788 [97 L.Ed.2d 638, 652-653, 107 S.Ct. 3114, 3121-3122] [even assuming an "actual conflict," reversal not required because the record did not support claim that defense counsel's "advocacy" was thereby "harmed"].)

■ From the time of the initial December 1983 hearing before the penalty retrial, it was obvious to all parties that the prosecution viewed defendant's involvement in the arson as a critical aggravating factor. It was the only evidence (other than that related to the murders) introduced by the

prosecution at the second penalty trial. The prosecution focused on the arson evidence to support its argument that although many people were involved in the Junghanses' murders, defendant was the most culpable because he was the only one who would actually commit the murders for money, just as he committed the arson for hire.[11]

Defendant asserts Hanson's conflict precluded him from effectively cross-examining Plankington, to expose his apparent bias. As noted above, between defendant's first and second trial, developments surfaced that could have been (but were not) used to impeach Plankington's testimony: Hanson failed to expose Plankington's obvious financial interest in establishing defendant's and Martin's involvement in the arson. In addition, Hanson failed to present any evidence to negate or mitigate defendant's involvement with that crime.[12] The jury was thereby left with the impression that defendant was primarily responsible for the arson.[13]

Despite these two identifiable omissions (the failure to cross-examine Plankington to expose his bias or to introduce evidence negating or mitigating defendant's role in the arson) the People argue defendant has failed to establish that the conflict adversely affected Hanson's performance.

In reviewing defendant's claim, we are bound by the record. (*Sullivan*, *supra*, 446 U.S. at p. 349 [64 L.Ed.2d at p. 347].) ■ But when a conflict assertedly causes an attorney not to pursue an argument or defense, a reviewing court cannot "see" the adverse effect on the record. Consequent-

---

[11] In his closing argument, the prosecutor noted that defendant had attempted to introduce evidence and impeach prosecution evidence to show that others were more responsible for the Junghanses' murders. But, the prosecutor argued, the evidence showed only that those persons were involved, and that it was defendant who actually committed the murders for money. "Look at the relative involvement there. How about the other people in the middle of that chain, . . . really their involvement is substantially less than the man who went in there with a weapon and actually killed two people . . . . [¶] In this case you have the actual killer who is willing to do it himself, actually, really; you would call him to do it, he's the murder mechanic. Murder mechanic is a simple term for him. He did the arson for hire that could have resulted in murder . . . . There could have been some deaths there. Really, he's a murder mechanic. He's willing to commit homicides for money and travel any distance, go to Las Vegas from Fresno. He'll go to Modesto."

[12] According to the one eyewitness account offered by a brothel employee (who stated two people committed the arson), and Plankington's civil complaint (which Hanson filed), others were involved in the arson. Hanson presented none of the available evidence (such as calling other witnesses or seeking to introduce evidence from the intervening federal criminal trial) to show that defendant was not solely responsible for the arson.

[13] This failure is striking when we contrast Hanson's strategy regarding the evidence of the Junghanses' murders. Hanson attempted to show, and stated in his closing argument, that there were lingering doubts about defendant's responsibility because of the involvement of others in planning and committing those murders. Hanson argued that this fact, and the relative culpability of other participants in the murders, meant the jury should sentence defendant to life without possibility of parole. (See *ante*, pp. 719-720.)

ly, we must examine the record to determine whether (i) the arguments or actions allegedly omitted would likely have been made by other counsel, and (ii) there was a tactical reason (other than the asserted conflict) that might have caused the omission. (See, e.g., *Burger* v. *Kemp, supra,* 483 U.S. 776, 786-788 [97 L.Ed.2d 638, 650-653, 107 S.Ct. 3114, 3120-3122]; *Glasser* v. *United States* (1942) 315 U.S. 60, 72-75 [86 L.Ed. 680, 700-702, 62 S.Ct. 457].) We therefore reject the People's suggestion that only "affirmative evidence" in the record can form the basis for a finding of adverse effect on counsel's performance.

For the reasons discussed below, we believe that any reasonably competent counsel who did not have a conflict between defendant and Plankington, would have impeached Plankington with the evidence about (and circumstances surrounding) his pending federal civil suit, and/or attempted at least to diminish defendant's role in the arson. And, we perceive no tactical reason why either area of inquiry would have been neglected by such counsel.

The People assert there are three reasons why defendant cannot show an adverse effect on Hanson's performance. They claim (i) there was significant evidence of defendant's involvement in the arson, hence Plankington's testimony was merely cumulative; (ii) Hanson did everything that an "unconflicted" counsel would have done to challenge the arson evidence; and (iii) Hanson's conflict actually helped defendant because it caused the prosecutor to refrain from introducing defendant's confession to the arson.

We reject each argument. First, Plankington's testimony was highly relevant to the arson issue. He provided the only eyewitness testimony linking defendant to Martin; he testified that he saw Martin and defendant together in a Nevada bar within days of the arson. Plankington also provided the motive for the arson; he testified about a long-running dispute between himself and Martin, which included threats by Martin. Moreover, Hanson's failure to adequately expose Plankington's possible bias on cross-examination was not the only adverse effect of the conflict. Hanson also failed to introduce any of the apparently available evidence negating or mitigating his client's involvement in the arson. (See *ante,* fn. 12.)

Next, the People assert Hanson did everything that unconflicted counsel reasonably could have done in defendant's defense. They claim that no further cross-examination of Plankington was possible because the jury would otherwise have learned of defendant's confession, and that by simply arguing that defendant had no role in the arson, Hanson adopted the strategy any competent counsel would have used.

There are two flaws in the People's argument. First, as we discuss below, it is far from clear that the confession could have been used against defendant at the penalty trial. (*Post,* fn. 16.) Moreover, defense counsel could have demonstrated Plankington had a bias—i.e., that it was in his financial interest to establish that defendant had been hired by Martin to commit the arson, because he had a lawsuit pending on that ground—without eliciting information about the confession. Counsel need only have asked Plankington whether he had a financial interest in proving defendant had been hired by Martin to commit the arson. The answer would have been "yes," and it would have been unnecessary to discuss defendant's confession. Details about Plankington's federal civil suit—the amount of damages he sought ($300,000 in special damages and $10 million in general damages), and the type of claims asserted—could also have been elicited without reference to defendant's confession.

Even assuming that for some reason the confession had to be revealed, competent defense counsel might still have chosen to impeach Plankington. Defense counsel could have argued that (i) under the circumstances the confession may have been involuntary, i.e., coerced by Plankington and his attorney, Hanson, who offered help to defendant (then on death row) if he would confess,[14] or (ii) the confession demonstrated that defendant was only marginally involved in the arson. Hanson, of course, could make none of these arguments, given his conflicting and simultaneous representation of Plankington.[15]

Finally, the People assert Hanson's conflict actually benefited defendant because that conflict allegedly caused the prosecutor to stipulate that he would not present evidence of defendant's confession. The record disproves this argument. Before trial, Hanson moved to exclude defendant's testimony about the arson on the ground defendant had been granted immunity in connection with that testimony. ▉ ▉ ▉ In his response brief, the prosecutor stated: "[T]his argument may have merit . . . . Based on the cases cited by the defense and in order to avoid any possibility of an issue on appeal in this regard, the People will not introduce the defendant's

---

[14]The defense at the second trial included psychiatric testimony that because of defendant's depression and grief following his daughter's death, he was subject to the influence of others and unable to protect his own interests. (*Ante,* pp. 719-720.) A similar argument might have been made with respect to defendant's state of mind following his first trial—i.e., that his confession was the product of such influences.

[15]In addition to the conflict, Hanson faced another obstacle to making these arguments. Had Hanson, despite his conflict, argued that defendant was coerced into making a confession—or that defendant was only marginally involved in the arson—Hanson's own role in obtaining the confession and pursuing the federal civil claim would also presumably become known. The ultimate result of such an argument would likely have damaged Hanson's credibility with the jury.

testimony or any statements he made as a result of immunity being granted to him in [the federal criminal trial]."[16] As the prosecutor realized, there was a well-founded legal reason why defendant's testimony could not be used against him at the penalty retrial—the grant of immunity. This argument would have been available to any counsel representing defendant at trial, not only to Hanson. We therefore reject the People's assertion that defendant enjoyed an advantage he would not otherwise have had, by reason of Hanson's representation.

■ We conclude other counsel would have performed differently, and more vigorously, in his examination of Plankington and his defense of the arson evidence; that Hanson had no strategic reason for failing to do so; and that Hanson's conflict of interest adversely affected his performance as defendant's counsel.[17]

4. *Alleged Waiver of Conflict*

■ The People argue that any conflict of interest was waived. ■ The right to conflict-free counsel may be waived. (*Sullivan, supra,* 446 U.S. at pp. 346-347 [64 L.Ed.2d at pp. 345-346]; *Maxwell* v. *Superior Court* (1982) 30 Cal.3d 606, at p. 619 [180 Cal.Rptr. 177, 639 P.2d 248, 18 A.L.R.4th 333].) That waiver, however, must be a " 'knowing, intelligent act[ ] done with sufficient awareness of the relevant circumstances and likely consequences.' " (*Mroczko, supra,* 35 Cal.3d at p. 110, quoting *Brady* v. *United States* (1970) 397 U.S. 742, 748, fn. omitted [25 L.Ed.2d 747, 756, 90 S.Ct. 1463].) In the context of a conflict presented by joint representation, we have held: "No particular form of inquiry is required, but, at a minimum, the trial court must assure itself that (1) the defendant has discussed the potential drawbacks of joint representation with his attorney, or if he wishes, outside counsel, (2) that he has been made aware of the dangers and possible consequences of joint representation in his case, (3) that he knows of his right to conflict-free representation, and (4) that he voluntarily wishes to waive that right. [Citations.] . . . . We indulge every reasonable presumption against the waiver of unimpaired assistance of counsel." (*Mroczko, supra,* 35 Cal.3d at p. 110.) The same considerations apply here.

We note that at the December 1983 trial setting conference, after hearing the public defender's explanation of the various conflicts, defendant repeat-

[16] Immunity granted by a federal court acts as a complete bar to any later use of such testimony, in any court, except for a prosecution for perjury. (See, e.g., 18 U.S.C. § 6002; *Kastigar* v. *United States* (1972) 406 U.S. 441 [32 L.Ed.2d 212, 92 S.Ct. 1653].)

[17] We would reach the same conclusion under our state-law conflict-of-counsel cases. (E.g., *Mroczko, supra,* 35 Cal.3d 86, 104-109 [applying a "somewhat more rigorous standard of review" than employed under federal law].)

edly stated he wanted Hanson as his attorney. In early January 1984, defendant rejected a suggestion that Hanson should not represent him, after the prosecutor raised the issue of a conflict because Hanson's name might be mentioned in any discussion of defendant's confession. At the hearing in March 1984 the possibility that Hanson might be called as a witness was discussed, but defendant reiterated his desire that Hanson be appointed. In April 1984, another discussion of Hanson's possible conflict occurred. The trial court advised defendant of his right to counsel free of any potential conflict, and that such counsel would be appointed for him if he chose. Defendant again indicated his desire to have Hanson represent him.

■■■ As in *Mroczko, supra,* 35 Cal.3d 86, however, there was no valid waiver here. At none of these hearings was there an indication that Hanson had discussed the conflict issue with defendant, or that defendant was offered the opportunity to discuss that matter with independent counsel. Although it appears the trial court informed defendant of his right to conflict-free counsel, defendant was never asked for a waiver. Finally, our review of the record does not reveal defendant was ever advised of the full range of dangers and possible consequences of the conflicted representation in his case.

Nevertheless, the People insist defendant twice "expressly waived" any conflict. These two asserted waivers occurred at the March and April hearings.

At the March hearing, Hanson was not present. As a result, the court and the prosecutor specifically stated that defendant was not being asked for any statement in the absence of his attorney. It would be difficult, in the face of such a statement, to now construe defendant's remarks at that hearing as an express waiver. Furthermore, neither the prosecutor nor the court fully explained to defendant the conflicts that faced Hanson. And, although the prosecutor informed the court about the possibility of a conflict, the only conflict mentioned was Hanson's involvement in obtaining defendant's confession, which, the prosecutor explained, meant that Hanson would face an ethical and legal conflict in putting defendant on the stand. As in *Mroczko,* we believe defendant's alleged waiver at the March 1984 hearing is evidence that he did not understand the true conflict issue, and that he perceived the prosecutor's concern simply as an attempt to prevent Hanson from representing him.[18]

---

[18] (See *ante,* p. 723.) As we said in *Mroczko, supra,* "[Defendant's] final comment, that he was aware of the possibility of a conflict but did not 'believe it,' should have alerted the trial court to the fact that he may not have understood the severity of the problem." (*Mroczko, supra,* 35 Cal.3d at p. 111.)

At the April hearing, the discussion focused on the possibility that Hanson might be required to be a witness. When the prosecutor noted that Hanson had represented Plankington in the arson matter and that Plankington was a probable witness at the penalty retrial, Hanson stated he felt this would not be a problem (in that, if necessary, the prosecution had other witnesses to testify regarding the confession), and that the judge who presided at the January hearing had agreed with that assessment. Hanson also stated he believed defendant's confession had to be excluded in any event, because of the federal immunity grant. Hanson then raised his prior representation of defendant's sister, and at this point the asserted "waiver" occurred. The judge told defendant that he had "a right to counsel who would be free of any potential conflict of interest and that such counsel would be appointed for him should he so desire." Defendant responded that he wanted Hanson to continue representing him. This exchange, however, was inadequate to make defendant aware of the dangers and possible consequences of the conflicted representation. No one explained to defendant that Hanson owed a conflicting duty of loyalty to Plankington that could affect his ability to cross-examine Plankington and attack the prosecution's arson evidence.[19]

The consequences addressed by the court and other parties were of an entirely different and less virulent sort. In discussing the conflict, the parties focused primarily on the possibility that Hanson might have to testify about the facts surrounding defendant's confession. This facet of the conflict, moreover, was presented by the court and by Hanson as a surmountable obstacle, and was conveyed to defendant as posing no serious conflict. Because the court identified only a minor portion of the potential consequences arising from Hanson's representation of Plankington and defendant, we cannot conclude that defendant fully understood the real scope of the conflict and intelligently waived it.[20]

Furthermore, the trial court was too eager to accept Hanson's representations that there was no conflict, or that problems posed by any conflict could be evaded. It is troublesome that, having learned that it was Hanson who had obtained defendant's confession to the arson, and that Hanson represented Plankington in a federal civil suit, the court made no further inquiry into the possible effect of the conflict on defendant's trial. (*Sullivan, supra,* 466 U.S. at pp. 347-348 [64 L.Ed.2d at pp. 345-347].) Instead,

---

[19]Nor was it explained to defendant that Hanson would be unable to attack the voluntariness or truthfulness of defendant's confession to the arson (should it be introduced in evidence) as a result of Hanson's involvement in obtaining that confession and pursuit of the federal civil suit on behalf of Plankington.

[20]This was also the pattern of the earlier hearings, at which the conflict that the parties discussed was the conflict facing Hanson should he be required to testify.

Hanson—who had manifestly taken an action adverse to defendant by obtaining from him a confession to a crime in order to benefit another client—was appointed defendant's counsel in a case in which the crime to which defendant had confessed was highly relevant. As was true of the counsel in *Mroczko,* Hanson's behavior "strongly suggests that he was unwilling or unable to assess accurately whether his representation of [defendant] was in [the client's] best interest . . . . The very fact that he was willing to represent such clearly conflicting interests despite the ethical and legal ramifications of his position, raises questions about his judgment, or at least his impartiality." (*Mroczko, supra,* 35 Cal.3d at p. 113.)

We conclude that the failure adequately to explain to defendant the consequences of Hanson's conflict precludes a finding that defendant knowingly waived the conflict.

### 5. *The Effect of Defendant's Concurrence in the Appointment of Counsel*

■ The People claim that Hanson was essentially a retained attorney because defendant specifically requested Hanson's assistance and thus defendant had the services of his counsel of choice. Consequently, they assert any conflict raised by the representation must be weighed against defendant's right to counsel of choice. (See *Maxwell, supra,* 30 Cal.3d at pp. 612-613.)

The situation in this case was not the equivalent, however, of that in *Maxwell.* There, the defendant both selected and paid his own counsel. The latter fact is the crux of the definition of "retained." Here, defendant's counsel was appointed and paid for by the state. Because counsel was provided by the state, the trial court was not required to appoint Hanson, even though he was the attorney whose services defendant preferred. (*Drumgo* v. *Superior Court* (1973) 8 Cal.3d 930, 934 [106 Cal.Rptr. 631, 506 P.2d 1007, 66 A.L.R.3d 984].) This rule holds true regardless of whether the requested attorney is a particular public defender or, as here, a private assigned counsel. Failure to appoint the attorney desired by a defendant is not interference with the right to counsel of choice. Conversely, the fact that a defendant is pleased with counsel appointed for him by a court does not transform his attorney into retained counsel. Because Hanson was not retained counsel, the special considerations that must be taken into account when a court contemplates the removal (over objection) of a retained attorney because of a conflict do not come into play here.

We conclude Hanson's simultaneous representation of defendant and Plankington resulted in an actual conflict of interest, and that Hanson's

performance was adversely affected by that conflict. We further conclude that the conflict was not knowingly and intelligently waived. Accordingly, the penalty judgment must be reversed. We discuss the following issue for guidance at retrial.

B. *Additional Instructions Regarding Accomplice Testimony Not Required*

The court gave two instructions about the jury's consideration of accomplice testimony. One defined an accomplice, and the other informed the jury that the testimony of an accomplice incriminating the defendant should be viewed with distrust. In addition, the court instructed the jury that Donald Davis, Kenneth Davis, Smith and Westmoreland were all accomplices as a matter of law.

■■■ Defendant argues the court committed prejudicial error because it failed sua sponte to give other specified instructions on the necessity that a conviction not be based on uncorroborated accomplice testimony. (§ 1111.)[21] He asserts failure to deliver these additional instructions was prejudicial because at the penalty phase of trial the jury was concerned with the degree of his culpability. Defendant claims that, had the jury been instructed that the various accomplices' testimony needed to be corroborated, it might have realized that others were as much or more involved in the murders as was defendant, and might therefore have voted for a sentence of life without possibility of parole rather than death.[22]

The People appear to assert there was no error, and that there was no duty to instruct sua sponte in this case. We agree.

The cases in which we have required corroboration of accomplice testimony at the penalty phase can be distinguished. (See, e.g., *People* v. *Varnum* (1967) 66 Cal.2d 808, 814-815 [59 Cal.Rptr. 108, 427 P.2d 772]; *People* v. *McClellan* (1969) 71 Cal.2d 793, 807-808 [80 Cal.Rptr. 31, 457 P.2d 871]; see also *People* v. *Miranda* (1987) 44 Cal.3d 57, 100 [241 Cal.Rptr. 594, 744 P.2d 1127].) In each case the prosecution sought to introduce evidence of unadjudicated prior criminal conduct. ■■■ Because such evidence may have a significant effect on the jury (*People* v. *Robertson* (1982) 33 Cal.3d

---

[21] That section provides in relevant part: "A conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof."

[22] Defendant argues that all of the evidence introduced at trial was consistent with a theory that Westmoreland alone, or with the aid of an (unidentified) accomplice, committed the homicides.

21, 54 [188 Cal.Rptr. 77, 655 P.2d 279]; *Varnum, supra,* 66 Cal.2d at p. 815), we have required the jury be instructed that it may consider such evidence only if the commission of the crime is proved beyond a reasonable doubt. (*Robertson, supra,* 33 Cal.3d at pp. 53-54.) ▉ As part of that higher standard of proof, we have also held that section 1111's accomplice corroboration requirement applies at the penalty trial when the People seek to prove a previously unadjudicated crime. (*Varnum, supra,* 66 Cal.2d at p. 814.)

Here, however, the only evidence before the jury involving a previously unadjudicated crime was that concerning the Nevada arson. Because no accomplice testimony was admitted on that point, there was no need for accomplice corroboration instructions as to that evidence. It is true that the jury had before it some accomplice testimony, but that testimony related solely to the Junghanses' murders. A jury had already found defendant guilty, beyond a reasonable doubt, of those murders, and hence no accomplice corroboration instruction was necessary as to that evidence. (Cf. *Robertson, supra,* 33 Cal.3d at p. 60 (Broussard, J., conc.); *People* v. *Rich* (1988) 45 Cal.3d 1036, 1122 [248 Cal.Rptr. 510, 755 P.2d 960].)

In addition, we have previously recognized that even if additional instructions may be proper, "a defendant for tactical considerations may not want the penalty phase instructions overloaded with a series of lengthy instructions . . . perhaps because he fears that such instructions could result in the jury placing undue significance on such other crimes rather than on the central question of whether he should live or die. In light of these tactical considerations, a defendant who has not requested an instruction . . . may not complain on appeal." (*People* v. *Phillips* (1985) 41 Cal.3d 29, 73 fn. 25 [222 Cal.Rptr. 127, 711 P.2d 423] [discussing whether jury should be instructed sua sponte on elements of alleged other crimes introduced at the penalty phase].) Defendant's case is similar: delivering the corroboration instructions even after the necessary corroboration must already have been found to exist—defendant having been convicted—might result in a jury placing undue significance on the fact that the accomplice testimony was corroborated, rather than on the penalty issue. Although instructing the jury on accomplice testimony would not be erroneous in this circumstance, it is not required in the absence of a specific request for such instructions.

The judgment of death is reversed. Because we reach this conclusion in defendant's appeal, the petition for a writ of habeas corpus is dismissed as moot.

Mosk, J., Broussard, J., Panelli, J., Arguelles, J., Eagleson, J., and Kaufman, J., concurred.