71 Cal.Rptr.3d 148 (2008)
158 Cal.App.4th 1516
The PEOPLE, Plaintiff and Respondent,
v.
Manuel Ortega PAREDES et al., Defendants and Appellants.
No. E040123.
Court of Appeal of California, Fourth District, Division Two.
January 16, 2008.
As Modified January 28, 2008.
*152 Mark L. Christiansen, under appointment by the Court of Appeal, for Defendant and Appellant Daniel Loreto Noriega.
Steven Schorr, under appointment by the Court of Appeal, San Diego, for Defendant and Appellant Manuel Ortega Paredes.
Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Senior Assistant Attorney General, Steve Oetting, Supervising Deputy Attorney General, and *153 Lise S. Jacobson, Deputy Attorney General, for Plaintiff and Respondent.
Certified for Partial Publication.[*]
OPINION
KING, J.

I. INTRODUCTION
Defendants Daniel Loreto Noriega and Manuel Ortega Paredes were charged in the same information with the first degree, premeditated murder of Cesar Cortez. (Pen.Code, § 187, subd. (a).)[1] It was further alleged that the murder was committed in the course of a carjacking and robbery or attempted carjacking and robbery (§ 190.2, subd. (a)(17)), and that Noriega personally and intentionally discharged a firearm in the commission of the murder (§ 12022.53, subd. (d)).
Defendants were tried together before separate juries. The juries found defendants guilty of first degree murder and found the special-circumstance allegations true. Noriega's jury also found the firearm allegation true. Both defendants were sentenced to life in prison without the possibility of parole. Noriega was sentenced to an additional 25 years to life for the firearm enhancement.
A third defendant, Juan Diego Vasquez, pled guilty to voluntary manslaughter and a firearm enhancement in exchange for a sentence of 12 years and his agreement to testify truthfully at trial. Following his plea agreement, Vasquez was diagnosed with cancer and the court ordered a conditional examination. The examination was held on June 1, 2005. Vasquez died on November 11, 2005, before trial commenced in December 2005. A videotape of the examination was played to both juries. Paredes and Noriega appeal, but do not join each other's contentions.
In the unpublished portion of this opinion, we address Paredes's contentions that (1) there is insufficient evidence to support his jury's true finding on the carjacking/robbery special-circumstance allegations, and (2) the trial court deprived him of his constitutional right to testify by refusing to accommodate his request that he testify only before his own jury. We reject these claims and affirm the judgment against Paredes in its entirety. Also in the unpublished portion of this opinion, we address Noriega's claim that the trial court erroneously admitted a confession he made to Paredes while the two of them were in police custody. We conclude that the confession was properly admitted.
In the published portion of this opinion, we address Noriega's further claim that the trial court abused its discretion and violated his federal and state constitutional rights in ordering the removal of his courtappointed counsel, the Riverside County Public Defender's Office and Deputy Public Defender James Ashworth. We also agree that the disqualification and removal of the public defender was an abuse of the trial court's discretion and violated Noriega's right to counsel under the state Constitution, and that the error is reversible per se. Accordingly, we reverse the judgment against Noriega.[2]

II. FACTS AND PROCEDURAL HISTORY

A. Prosecution Evidence

1. Background

In 2001, Vasquez and Paredes were using and selling methamphetamine "fronted" *154 or loaned to them by a group called Circulo De La Familia (La Familia). Paredes and Vasquez would divide the methamphetamine they received, loan portions of it to others, and retain some of it for their personal use. Vasquez would pay La Familia for the drugs when the customers paid him.
In the fall of 2001, Vasquez received three to five ounces of methamphetamine from La Familia. He divided it into thirds. He loaned one-third, or $750 worth of it, to his best friend Cesar Cortez, and another third to a man known as Payaso. Vasquez and Paredes kept the other one-third for their personal use.
By early November 2001, Vasquez and Paredes still owed La Familia $1,500, and La Familia was pressuring Vasquez for payment. Payaso was in jail at the time and unable to pay. Fearing La Familia would hurt him, his family, or his friends if he did not pay, Vasquez focused on collecting Cortez's debt. Paredes was angry because Cortez had failed to pay his debt.
On Thursday, November 8, Vasquez went to Cortez's house where he lived with his brother, Dario. Vasquez told Dario that Cortez owed him money for drugs, Cortez had until November 10 to get the money, and "something bad" would happen if he failed to pay. Vasquez also told Dario his "cousins" "weren't bullshitting."[3] Vasquez also gave Dario a letter for Cortez which Dario gave to Cortez the next day. Cortez promised to pay Vasquez on Saturday, November 10, but failed to do so.
On Monday, November 12, Paredes called Vasquez and told him it was time to collect the debt from Cortez. Paredes's sister, Antonia, agreed to loan her blue Ford Escort to Paredes and Noriega, after they assured her, they were going to her mother's house and not to Vasquez's house. Noriega was Antonia's boyfriend, and Noriega and Paredes were friends. Noriega was not involved in Vasquez's and Paredes's drug dealings, however.
Around 7:00 p.m. on November 12, Paredes and Noriega arrived at Vasquez's house in the Escort. From there, Vasquez drove the three of them to Cortez's house in Vasquez's Grand Am. Vasquez spoke with Cortez about paying the debt, while Paredes and Noriega waited in the Grand Am Cortez told Vasquez he did not have the money but he would pay the following morning. Vasquez trusted Cortez, and agreed to wait until the following morning for payment. Vasquez described the conversation as friendly.
On the way back to Vasquez's house, Vasquez told Paredes about his agreement with Cortez. Paredes was angry; he said Cortez was not a man of his word and he had already had enough time to pay the debt. He also said he was going to return to Cortez's house and take his car. Noriega offered to help. The two of them discussed using violence, if necessary, to take the car.
After Vasquez, Paredes, and Noriega returned to Vasquez's house, Noriega got in the Escort while Paredes and Vasquez went inside the house. Paredes obtained an AK-47 rifle that he and Vasquez owned. The rifle was in a case. Paredes also obtained a screwdriver and slim jim.
Vasquez warned Paredes not to do anything "stupid" and not to involve him in anything. Paredes told Vasquez he was only going to Cortez's house to take his car. He also said he was going to "clear things up" with Cortez, which Vasquez understood as meaning he was going to "get *155 whatever he wanted" from Cortez. Paredes then drove away in the Escort with Noriega.

2. The Shooting

Around 8:00 p.m., Paredes and Noriega arrived at Cortez's house. Paredes got out of the car, knocked on the front door, and identified himself to Dario as Manuel. Dario had just gotten out of the shower and opened the door in his boxer shorts. Paredes told Dario he was looking for Cortez. Dario shut the door and told Cortez that Paredes was outside looking for him.
Dario suspected something was wrong and that Paredes was going to carjack Cortez. Dario walked down the hall and began putting on his pants. As he did so, he heard Cortez yell his name. He opened the door, took a few steps outside, and asked what was going on. Dario saw Noriega at their gate, pointing a gun at him. Dario heard Cortez say, "Don't. Leave him out of this."
Dario ran back inside, shut the door, and tried to get to the telephone. About 10 seconds later, he heard a gunshot. He ran outside and saw Cortez hanging halfway out of his car door. Cortez had been shot. Paredes and Noriega ran from Cortez's driveway to the Escort and fled.
Cortez bled to death from the gunshot wound. Forensic and ballistics evidence showed that a copper-jacketed bullet fired from the AK-47 passed through the back window of Cortez's car and entered his back, just below his left shoulder blade. The bullet pierced his heart, lung, and liver before lodging in his gall bladder.
A deputy found Cortez's car keys and a glass smoking pipe on his person. Other deputies found pay/owe sheets, a plastic baggie with a trace of a white powdery substance, and a portable scale in Cortez's bathroom.

3. Events Following the Shooting

After the shooting, Paredes and Noriega returned home to Rubidoux where they shared a converted garage with Antonia and her daughter. Antonia heard the two men whispering. She was angry because she knew they had gone to Vasquez's house even though she told them Vasquez should take care of his own debts and not to get involved. She sensed something bad had happened, but Paredes and Noriega would not tell her anything. Instead, Paredes asked her to say he was with his girlfriend all evening if anyone asked.
Antonia called Vasquez and asked him whether he had gotten Paredes in trouble. She told Vasquez to say Paredes was with his girlfriend that evening if anyone asked.
Later that night, Paredes tried to sell the AK-47 to Sylvia Higareda, the person who owned the home with the converted garage. Higareda and Vasquez were friends. Higareda, who only saw the rifle case, did not purchase the rifle. The next day, Higareda saw Paredes in her backyard with something that looked like a piece of wood or a rifle. Paredes told Higareda he was looking for some wood to put in the window because of the cold. Higareda never saw Noriega with a firearm.
Deputies arrested Vasquez on November 13. He told the deputies that Paredes and Noriega were involved in the shooting and showed them where they lived in Rubidoux. The following day, November 14, police arrested Noriega at the Rubidoux residence.
During a search of the Rubidoux residence, Higareda directed sheriffs deputies to the area in the backyard where she had seen Paredes with the wood or rifle the *156 previous morning. There, deputies found the AK-47 under a pile of debris.
At Noriega's family home, deputies found a man's black jacket, size double extra large. Dario described the shooter to deputies as a Hispanic man, six feet three to six feet four inches tall, wearing a baggy black hooded windbreaker. Noriega is six feet four inches tall.
Two days after Noriega's arrest, deputies arrested Paredes at his family home in Moreno Valley. In a converted bedroom of the home, deputies found ammunition and a .22-caliber rifle. The blue Escort was parked on the street outside the house.

4. Paredes's and Noriega's Videotaped Interviews

Sheriffs investigator Joseph Borja interviewed Paredes and Noriega on November 15, after each of them were advised of and waived their Miranda[4] rights. Noriega later invoked his Miranda rights by telling Borja he no longer wanted to talk. Noriega's jury, the red jury, heard an audiotape of the portion of Noriega's interview that took place before he invoked his Miranda rights.[5] Borja also testified about this part of the Noriega interview.
During the portion of Noriega's interview that was played to the red jury, Noriega admitted he was in the car with Paredes and Vasquez when Vasquez confronted Cortez about the debt on the night of the shooting. He also admitted that the three of them returned to Vasquez's house after leaving Cortez's house, and that he stayed outside while Paredes went inside the house with Vasquez. He said Paredes left Vasquez's house empty-handed, then drove him home to Rubidoux where he went to sleep.
Paredes's jury, the blue jury, heard an audiotape of Paredes's interview. Like Noriega, Paredes admitted he went with Noriega and Vasquez to Cortez's house to collect the debt, but he denied going back to Cortez's house in the Escort and knocking on the door. Instead, he claimed he went home afterward and spent the rest of the night with his girlfriend. He also claimed that the next day Vasquez told him that a Cuban had killed Cortez. Vasquez had referred to his drug supplier as a Cuban.
At one point, Borja had Paredes and Noriega speak to each other alone in one of the interview rooms. Both juries heard an audiotape of the conversation between Paredes and Noriega that followed. During their conversation, Noriega repeatedly told Paredes he "did it," meaning he shot Cortez, and that Paredes had nothing to do with the shooting. Then, after Paredes said he did not want to be sent to prison for something he did not do, Noriega said, "That's why I said I did it [homes]. You didn't know nothing about it. I took off with the car and I did it [homes]."
After the conversation between Paredes and Noriega, Borja conducted a follow-up interview with Paredes. This interview was also played to Paredes's jury, the blue jury. During this interview, Paredes initially claimed Noriega took his car for half an hour and he had no idea what Noriega did during that time. He later said it was Noriega's idea to take Cortez's car, that the two of them drove to Cortez's house, *157 and he went to the front door and asked Cortez to come outside. Paredes and Cortez then got in Cortez's car. Paredes asked Cortez for his car keys and told him Noriega wanted to take the car as collateral.
After Cortez agreed to give Paredes his car keys, Noriega approached with an A47 and ordered Cortez to "[g]et out [of] the fuckin', fuck out of the car." Paredes said to Noriega, "What the fuck you doing. It's not, we're not supposed to do this, I'm not a fuck that, give you a car." Paredes then warned Noriega not to do anything stupid, and walked over to the Escort. As he did so, he heard Cortez call for his brother, Dario. Noriega panicked and the gun discharged.
After the shooting, Noriega got in the Escort as Paredes was beginning to drive away from the scene. Inside the car, Paredes said to Noriega, "[W]hat the fuck did you do? How fucking stupid are you? How you gonna fucking take somebody's life over some fucking money?" Paredes claimed he did not intend to kill Cortez and just went to his house to take his car. He intended to leave if Cortez did not give him the car keys.
Both juries heard that, when Noriega and Vasquez were on the same transport bus, Noriega confronted Vasquez, called him a "snitch," and told him to be quiet. When Vasquez stood up to respond, Noriega head butted him in the face. Both men's hands were chained to their waists at the time.
Paredes's jury learned that, during a prisoner transport in 2003, Paredes warned Higareda, his former landlady who was then in custody for robbery, not to say anything because he knew where her children lived. He also said, "If you say something, your son is next," and he made a threatening gesture.

B. Noriega's Defense

Noriega's defense was that the prosecution failed to establish beyond a reasonable doubt that he was the shooter. A sheriffs deputy who interviewed Dario on the night of the shooting testified that Dario said the shooter was wearing a black jacket with the hood pulled over his head, and he would not be able to identify the shooter.
During a later interview at the district attorney's office, Dario said he had seen the shooter somewhere before and believed he could identify him. Dario admitted, however, that shortly before the interview he entered the courtroom for a few seconds and made eye contact with Vasquez, but not with the two men sitting next to him. He did not see the faces of the two men. Nor did he get a good look at them; his attention was focused on Vasquez. Dario left the courtroom at the prosecutor's behest.
Noriega's older brother testified that Noriega moved from the family home a week before the shooting, and that the black jacket the deputies found at the family home belonged to him, not Noriega.

C. Paredes's Defense

Paredes did not present an affirmative defense. His counsel argued he was not guilty of murder because he was shocked and surprised by Noriega's actions.

III. DISCUSSION
A.-C.[**]

*168 D. The Pretrial Disqualification and. Removal of Noriega's Appointed Counsel Renders the Judgment Against Noriega Reversible Per Se

Noriega claims the trial court both abused its discretion and violated his right to counsel under the federal and state Constitutions (U.S. Const., Amends. VI, XIV; Cal. Const., art. I, § 15) in disqualifying and ordering the removal, in December 2002, of his court-appointed counsel, the Riverside County Public Defender's Office (the public defender) and Deputy Public Defender James Ashworth (Attorney Ashworth). Following the removal order, the court appointed alternative defense counsel, Peter Morreale (Attorney Morreale), to represent Noriega. Attorney Morreale represented Noriega through trial in December 2005 and at sentencing in February 2006.
Noriega also claims that the trial court's removal of the public defender and Attorney Ashworth, over his objection and long before his trial began, renders the judgment against him reversible per se because he had an existing attorney-client relationship with Attorney Ashworth. The People argue that the trial court neither abused its discretion nor violated Noriega's federal or state constitutional right to counsel in removing the public defender and Attorney Ashworth. Alternatively, the People argue that reversal of the judgment is not required because Noriega did not seek pretrial writ review of the removal order, and has not shown he was prejudiced by the removal order.
We conclude that the trial court abused its discretion in disqualifying and ordering the removal of Attorney Ashworth, and that the removal order violated Noriega's right to counsel under the state Constitution. We also conclude that the error renders the judgment against Noriega reversible per se.

1. Relevant Background

Noriega, Paredes, and Vasquez were jointly charged in a felony complaint filed on November 15, 2001. At Noriega's arraignment on November 29, the public defender's office was appointed to represent Noriega, and Attorney Ashworth appeared as Noriega's counsel of record. Paredes and Vasquez were represented by members of the conflict panel. The preliminary hearing was held on March 28, 2002.[7] Attorney Ashworth represented Noriega at the preliminary hearing, and continued to represent him through late December 2002.
On December 6, 2002, the court continued the trial date because the prosecutor had additional discovery to distribute to the defense. Some of the discovery concerned a potential prosecution witness, later identified as Coin Tran, who allegedly heard Noriega make "tacit admissions" of his guilt. It was later revealed that Tran witnessed the encounter between Noriega and Vasquez On the transport bus, and was expected to testify that Noriega called Vasquez a "snitch" and head butted him. The prosecutor was awaiting reports on the incident and impeachment materials concerning Tran.[8]
On December 19, the court and the parties conferred regarding a possible conflict of interest between Noriega and the public defender's office, and counsel agreed to *169 further research the issue. On December 30, the court and the parties met to discuss the possible conflict. At the meeting, the prosecutor advised the court he intended to call Coin Tran in his case-in-chief against Noriega, and that Deputy Public Defender Mark Johnson had previously represented Tran. Attorney Ashworth and Supervising Deputy Public Defender De Prisco were also present at the hearing. De Prisco told the court he had reviewed Tran's file in accordance with office policy, and determined his office had no conflict of interest in representing Noriega even if Tran were to testify.
The court asked De Prisco why there were no conflicts. De Prisco responded, "just because a former client testifies against a present client doesn't make it a conflict." De Prisco also said he could not discuss the matter in open court because it was confidential. He also said that, based on the police reports, his office anticipated that Tran would not implicate Noriega in the transport bus incident or testify as the prosecution expected. The court then asked De Prisco whether it was supposed to accept his word that no conflicts existed when he could not explain why there was no conflict. De Prisco answered affirmatively, but added, "If the Court were to inquire in camera, I could discuss with you the reasons why there is no conflict with Mr. Tran." De Prisco briefly explained that "when there are no secrets or confidences in a former client's file ... there [are] no conflicts."
The court did not conduct a hearing in camera, as De Prisco suggested. Instead, it asked the prosecutor to respond to De Prisco's argument. The prosecutor said he was not making a motion to remove the public defender's office. Instead, he was only bringing the matter to the court's attention because he believed he had an ethical obligation to do so. Counsel for Vasquez said there was a conflict "per se" because Attorney Ashworth was in the position of having to cross-examine Tran, a former client of the public defender's office. The court indicated it agreed with that view and it was therefore in Noriega's interest to remove the public defender.
In response to the court's questions, Noriega said he did not believe the public defender's office had a conflict of interest involving Tran; he would waive any conflict of interest if there was one; and he wanted Attorney Ashworth to continue as his attorney. Attorney Ashworth said he had spent a considerable amount of time with Noriega and had put a lot of work into the case. The court indicated that Noriega's waiver carried little weight because he was not being represented by independent counsel on the conflict question. The prosecutor added that Tran would also have to waive any conflict of interest. Attorney Ashworth said he would not know who Tran was if he walked into the courtroom that day.
After listening to Noriega's protestations and further argument, the court ordered the public defender and Attorney Ashworth removed as Noriega's counsel. De Prisco indicated his office would take a writ, but no writ petition challenging the court's order was ever filed. The court later appointed Attorney Morreale to represent Noriega. Attorney Morreale appeared for Noriega on January 6, 2003, and continued to represent him at trial in December 2005 and at the sentencing hearing in February 2006.

2. Overview of Applicable Law

A criminal defendant has a right to "assistance of counsel" under the Sixth and Fourteenth Amendments of the federal Constitution (United States v. Gonzalez-Lopez (2006) 548 U.S. 140, 126 S.Ct. 2557, 2561, 165 L.Ed.2d 409 (Gonzalez-Lopez)) and under article I, section 15 of the California Constitution (People v. Jones (2004) 33 Cal.4th 234, 244, 14 Cal.Rptr.3d 579, 91 P.3d 939 (Jones)). The right to assistance of counsel includes the right to "effective assistance of counsel" (Strickland v. Washington (1984) 466 U.S. 668, 686, 104 S.Ct. *170 2052, 80 L.Ed.2d 674; People v. Ledesma (1987) 43 Cal.3d 171, 215, 233 Cal.Rptr. 404, 729 P.2d 839), and a "correlative right to representation that is free from conflicts of interest" (Wood v. Georgia (1981) 450 U.S. 261, 271, 101 S.Ct. 1097, 67 L.Ed.2d 220; Maxwell v. Superior Court (1982) 30 Cal.3d 606, 612, 180 Cal.Rptr. 177, 639 P.2d 248).
Subject to certain limitations, the Sixth Amendment also guarantees a criminal defendant the right to be represented by counsel of his choice. (Wheat v. United States (1988) 486 U.S. 153, 159, 108 S.Ct. 1692, 100 L.Ed.2d 140 (Wheat).) "`[T]he Sixth Amendment guarantees the defendant the right to be represented by an otherwise qualified attorney whom that defendant can afford to hire, or who is willing to represent the defendant even though he is without funds.'" (See Gonzalez-Lopez, supra, 126 S.Ct. at p. 2561, quoting Caplin & Drysdale, Chartered v. United States (1989) 491 U.S. 617, 624-625, 109 S.Ct. 2646,105 L.Ed.2d 528.)
But an indigent criminal defendant who, by definition, cannot afford to hire his own attorney or otherwise secure the representation of counsel of his choice regardless of his ability to pay, does not have a right, under either the federal or state Constitution, to select his appointed counsel. (Gonzalez-Lopez, supra, 126 S.Ct. at p. 2565 ["the right to counsel of choice does not extend to defendants who require counsel to be appointed for them"]; Jones, supra, 33 Cal.4th at p. 244, 14 Cal. Rptr.3d 579, 91 P.3d 939 ["the state Constitution does not give an indigent defendant the right to select a court-appointed attorney"].) Instead, it is the function of the trial court, in the exercise of its sound discretion, to select and appoint counsel for an indigent defendant. (§ 987; Harris v. Superior Court (1977) 19 Cal.3d 786, 794-796, 140 Cal.Rptr. 318, 567 P.2d 750 (Harris); Drumgo v. Superior Court (1973) 8 Cal.3d 930, 933,106 Cal.Rptr. 631, 506 P.2d 1007.) In certain circumstances, however, a trial court abuses its discretion if it refuses to honor an indigent defendant's request for appointment of an attorney with whom the defendant has an existing relationship. (Harris, supra, at pp. 795-799, 140 Cal.Rptr. 318, 567 P.2d 750.)
In addition, the California Supreme Court has recognized that, "once counsel is appointed to represent an indigent defendant, whether it be the public defender or a volunteer private attorney, the parties enter into an attorney-client relationship which is no less inviolable than if counsel had been retained. To hold otherwise would be to subject that relationship to an unwarranted and invidious discrimination arising merely from the poverty of the accused." (Smith v. Superior Court (1968) 68 Cal.2d 547, 562, 68 Cal.Rptr. 1, 440 P.2d 65, fn. omitted (Smith).)[9] It follows that "[t]he removal of an indigent defendant's appointed counsel, which occurred here, poses a greater potential threat to the defendant's constitutional right to counsel than does the refusal to appoint an attorney requested by the defendant...." (Jones, supra, 33 Cal.4th at p. 244, 14 Cal.Rptr.3d 579, 91 P.3d 939.)
In Wheat, supra, 486 U.S. at page 159, 108 S.Ct. 1692, the United States Supreme Court recognized that the federal constitutional right to counsel of one's choice is "circumscribed in several important respects," including, for example, when the defendant's chosen counsel has a conflict of interest because that counsel has "a previous *171 or ongoing relationship with an opposing party." The specific question presented in Wheat was "the extent to which a criminal defendant's right under the Sixth Amendment to his chosen attorney is qualified by the fact that the attorney has represented other defendants charged in the same criminal conspiracy." (Ibid.) In view of the "special dangers" posed by multiple representation, the high court in Wheat held that, under the federal Constitution, courts have "substantial latitude" to refuse a defendant's proffered waiver of his counsel's conflict or potential conflict of interest. (Id. at pp. 161-163, 108 S.Ct. 1692.) As the high court explained, "courts have an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them.... Not only the interest of a criminal defendant but the institutional interest in the rendition of just verdicts in criminal cases may be jeopardized by unregulated multiple representation." (Id. at p. 160, 108 S.Ct. 1692.)
Similarly, under California law, a trial court may relieve counsel for a defendant, on its own motion and over the objection of the defendant or his counsel, "`to eliminate potential conflicts, ensure adequate representation, or prevent substantial impairment of court. proceedings.'" (People v. Cole (2004) 33 Cal.4th 1158, 1187, 17 Cal.Rptr.3d 532, 95 P.3d 811, citing People v. McKenzie (1983) 34 Cal.3d 616, 629, 194 Cal.Rptr. 462, 668 P.2d 769, disapproved on other grounds in People v. Crayton (2002) 28 Cal.4th 346, 364-365, 121 Cal.Rptr.2d 580, 48 P.3d 1136.)[10] On appeal, a trial court's disqualification and removal of counsel for an indigent defendant is reviewed for an abuse of discretion. (See, e.g., People v. Cole, supra, at p. 1187, 17 Cal.Rptr.3d 532, 95 P.3d 811.)
But California decisions "limit severely the judge's discretion to intrude on defendant's choice of counsel in order to eliminate potential conflicts, ensure adequate representation, or serve judicial convenience." (Maxwell v. Superior Court, supra, 30 Cal.3d at p. 613, 180 Cal.Rptr. 177, 639 P.2d 248, italics added.) Our state courts have rejected Wheat's "paternalistic treatment" of a criminal defendant's right to counsel of his choice, and make the defendant the "master of his own fate." (Alcocer v. Superior Court (1988) 206 Cal.App.3d 951, 956-957, 254 Cal.Rptr. 72 (Alcocer).) Under the California Constitution, "the involuntary removal of any attorney is a severe limitation on a defendant's right to counsel and may be justified, if at all, only in the most flagrant circumstances of attorney misconduct or incompetence when all other judicial controls have failed." (Cannon v. Commission on Judicial Qualifications (1975) 14 Cal.3d 678, 697, 122 Cal.Rptr. 778, 537 P.2d 898.)
Our courts recognize that the right of a defendant "to decide for himself who best can conduct the case must be respected wherever feasible." (Maxwell v. Superior Court, supra, 30 Cal.3d at p. 615, 180 Cal.Rptr. 177, 639 P.2d 248, fn. omitted; People v. Easley (1988) 46 Cal.3d 712, 729, 250 Cal.Rptr. 855, 759 P.2d 490 [criminal defendant may knowingly and intelligently waive his right to conflict-free counsel].) "[T]he state should keep to a necessary minimum its interference with the individual's desire to defend himself in whatever manner he deems best ... [and] that desire can constitutionally be forced *172 to yield only when it will result in significant prejudice to the defendant ... or in a disruption of the orderly processes of justice unreasonable under the circumstances of the particular case." (People v. Crovedi (1966) 65 Cal.2d 199, 208, 53 Cal.Rptr. 284, 417 P.2d 868 (Crovedi); People v. McKenzie, supra, 34 Cal.3d at pp. 629-630, 194 Cal.Rptr. 462, 668 P.2d 769.)
Thus, a trial court's discretion to disqualify and remove an attorney with whom an indigent criminal defendant has an existing attorney-client relationship is far more limited under California law than it is under the federal Constitution. (See, e.g., Jones, supra, 33 Cal.4th at pp. 250-252, 14 Cal.Rptr.3d 579, 91 P.3d 939 (cone, opn. of Werdegar, J.); People v. Easley, supra, 46 Cal.3d at p. 729, fn. 17, 250 Cal.Rptr. 855, 759 P.2d 490; Alcocer, supra, 206 Cal.App.3d at p. 958, 254 Cal. Rptr. 72.)

3. Analysis

This case implicates the tension between (1) a trial court's authority to eliminate conflicts of interest, both actual and potential, and to ensure that a defendant has adequate representation, and (2) the state constitutional right of an indigent criminal defendant to continue being represented by an attorney with whom he has an existing attorney-client relationship. The specific issues presented are (1) whether the trial court abused its discretion in removing the public defender and Attorney Ashworth over defendant's objection and his proffered waiver of any conflict involving Tran, (2) whether the removal violated Noriega's right to counsel under the federal and state Constitutions, and (3) whether the error, if any, is reversible per se. We address these questions in that order.

(a) Abuse of Discretion

In Rhaburn v. Superior Court (2006) 140 Cal.App.4th 1566, 45 Cal.Rptr.3d 464 (Rhaburn), this court discussed the factors to be considered in disqualifying the public defender's office from representing a defendant. We rejected a per se rule of disqualificationthat is, that the entire public defender's office is to be disqualified from representing a defendant whenever it has previously represented a witness or victim in the defendant's case. (Id. at p. 1574, 45 Cal.Rptr.3d 464, discussing State Bar Standing Com. on Prof. Responsibility & Conduct, Formal Opn. No. 1980-52 to the effect that the public defendermeaning the entire officeshould be disqualified from representing a defendant if a previous client is also involved in the case as a potential witness.) We recognized that "a rigid rule of disqualification can create hardship to the new client and can also be abused as an improper tactical maneuver," by the prosecution, and that courts had recently begun to develop more flexible strategies for dealing with potential conflicts. (Rhaburn, supra, at pp. 1575-1577, 45 Cal.Rptr.3d 464.)
Under the more flexible approach, courts examine whether counsel has obtained or is likely to obtain confidential information regarding the former client. If not, disqualification is not mandatory. In appropriate cases, the court can accept counsel's representation that there are no conflicts and, on that basis, decline to apply a rigid rule of implied receipt of confidences. (Rhaburn, supra, 140 Cal.App.4th at pp. 1575-1578, 45 Cal.Rptr.3d 464, and cases discussed.)[11]
We explained that, for several reasons, the more flexible approach is particularly appropriate to the public defender's office. Public defenders typically *173 handle a high volume of cases and are therefore unlikely to remember any confidential information imparted by "the average past client." (Rhaburn, supra, 140 Cal.App.4th at p. 1579, 45 Cal.Rptr.3d 464.) Thus, "[t]he risk that confidential information will be passed through casual 'watercooler' conversations is substantially less than in the private sector." (Ibid.) In addition, "frequent disqualifications substantially increase the cost of legal services for public entities." (Id. at p. 1580, 45 Cal.Rptr.3d 464.) And, when there is no conflict, the wishes of the defendant to continue with the deputy public defender with whom the defendant has formed a relationship should be respected. (Id. at p. 1581, 45 Cal.Rptr.3d 464.)
Thus, in Rhaburn, we disapproved of applying the per se rule of disqualification to the public defender where the public defender's office has previously represented a witness. We stressed that, where the deputy handling the defendant's case did not have a "direct and personal relationship" with the witness or former client, "the direct acquisition of confidential information need not (and should not) be presumed." (Rhaburn, supra, 140 Cal. App.4th at p. 1581, 45 Cal.Rptr.3d 464.) Instead, we said "courts should normally be prepared to accept the representation of counsel, as an officer of the court, that he or she has not in fact come into possession of any confidential information acquired from the witness and will not seek to do so." (Rhaburn, supra, 140 Cal. App.4th at p. 1581, 45 Cal.Rptr.3d 464.) Furthermore, "the trial court should evaluate the totality of the circumstances in determining whether there is a reasonable possibility that the individual attorney representing defendant either has obtained confidential information about the witness collected by his or her office, or may inadvertently acquire such information through file review, office conversation, or otherwise." (Ibid.)
Here, contrary to our decision in Rhaburn,[12] the trial court applied the per se rule of disqualification. It ordered the removal of the entire public defender's office, including Attorney Ashworth, based solely on the office's prior representation of potential prosecution witness Tran, notwithstanding that: (1) Noriega's trial counsel, Ashworth, had not personally represented Tran; (2) Attorney Ashworth's supervisor, De Prisco, represented he had reviewed the matter and found the public defender's office had no confidential information concerning Tran; and (3) Noriega told the court he wanted Attorney Ashworth to remain as his trial counselregardless of any actual or potential conflict involving Tran. (Rhaburn, supra, 140 Cal. App.4th at pp. 1575-1577, 45 Cal.Rptr.3d 464.)
We recognize the trial court was concerned with the mere possibility of a conflict involving Tran and "`considerations of ethics which run to the very integrity of our judicial process.'" (Comden v. Superior Court (1978) 20 Cal.3d 906, 915, 145 Cal.Rptr. 9, 576 P.2d 971.) Indeed, it has been said that the "paramount concern" of courts in determining whether to disqualify counsel is the "preservation of public trust in the scrupulous administration of justice and the integrity of the bar." (Jessen v. Hartford Casualty Ins. Co. (2003) 111 Cal.App.4th 698, 705, 3 Cal.Rptr.3d 877, citing Comden v. Superior Court, supra, at p. 915, 145 Cal.Rptr. 9, 576 P.2d 971.) But long before Rhaburn was decided, our state Supreme Court held that, *174 subject to certain exceptions, "the mere possibility of a conflict does not warrant pretrial removal of competent counsel in a criminal case over defendant's informed objection." (Maxwell v. Superior Court, supra, 30 Cal.3d at p. 619, 180 Cal.Rptr. 177, 639 P.2d 248, fn. omitted, italics added.)
We also recognize that the trial court was faced with a dilemma. If it accepted Noriega's proffered waiver of the potential conflict involving Tran, and an actual conflict arose during trial, Noriega could have claimed on appeal that he did not receive effective assistance of counsel at trial and that he did not waive the conflict because the ramifications of the conflict were not fully explained to him. On the other hand, if the trial court rejected Noriega's proffered waiver, as it did, then Noriega could claim, as he does here, that the trial court abused its discretion and violated his state and federal rights to counsel in rejecting his waiver. (See Alcocer, supra, 206 Cal. App.3d at pp. 958-959, 254 Cal.Rptr. 72.)
This dilemma is not new. In Wheat, supra, 486 U.S. 153 at page 161, 108 S.Ct. 1692, 100 L.Ed.2d 140, the high court expressed concern that "trial courts confronted with multiple representations face the prospect of being Vhipsawed' by assertions of error no matter which way they rule." Recognizing this dilemma, the court in Alcocer, supra, 206 Cal.App.3d at pages 961 through 963, 254 Cal.Rptr. 72 proposed a solution, or a set of "general guidelines for the trial court to follow when confronted with a potential conflict."
The Alcocer court said: "Once the trial court determines that a conflict may exist, the court should then briefly set forth the basis for its conclusion. The court must advise the defendant that his lawyer may not be able to effectively and adequately represent him. The court must inform him that this means he may not receive a fair trial if the attorney should continue to represent him.
"The court should appoint independent counsel ... to confer with the defendant regarding the conflict. If after conferring with independent counsel the defendant should still wish to continue with his attorney despite the conflict, the court should ask the defendant if he understands that the conflict, or potential conflict, facing his lawyer could prevent his lawyer from representing him effectively or adequately.
"If he answers yes,' the court should then ask defendant if the only reason he is keeping his present lawyer is because of financial reasons concerning fees already paid the attorney, or fees owed the attorney. If the defendant answers `yes' to that question, the trial court should inform defendant that if he is financially unable to retain more than one attorney, separate counsel will be appointed by the court and paid for by the government. [Citations.]
"If the answer to the question is `no,' the court should then ask defendant if he understands that, by proceeding with his current counsel, his chances of being convicted are greater than would be the case if he were represented by a conflict-free attorney. The court should also advise [the] defendant that by waiving his right to conflict-free counsel he also waives his right to appeal the issue of incompetence of counsel insofar as it involves the conflict.
"The court should then say: `Having been advised of the right to be represented by an attorney free from conflict, and having understood the disadvantages and dangers in being represented by an attorney with a conflict, do you specifically give up the right to be represented by an attorney who has no conflict of interest?' If the defendant answers `yes,' the court should then ask: `Do you specifically give up the right to appeal the issue of incompetence of counsel insofar as it involves the conflict?' " (Alcocer, supra, 206 Cal.App.3d at pp. 961-962, 254 Cal.Rptr. 72.)
The court in Alcocer recognized that conflict of interest waivers, like *175 all waivers of constitutional rights, must be knowing and intelligentthat is, made with sufficient awareness of the relevant circumstances and likely consequences. (Alcocer, supra, 206 Cal.App.3d at p. 961, 254 Cal.Rptr. 72, citing People v. Mroczko (1983) 35 Cal.3d 86, 109-110, 197 Cal.Rptr. 52, 672 P.2d 835.) Before a court may accept a conflict of interest waiver, it "must assure itself that (1) the defendant has discussed the potential drawbacks of joint [or conflicted] representation with his attorney, or if he wishes, outside counsel, (2) that he has been made aware of the dangers and possible consequences of joint representation in his case, (3) that he knows of his right to conflict-free representation, and (4) that he voluntarily wishes to waive that right." (People v. Mroczko, supra, at p. 110, 197 Cal.Rptr. 52, 672 P.2d 835; Alcocer, supra, at p. 961, 254 Cal.Rptr. 72.) "The court must allow the accused reasonable time to consider its admonition, and must secure from the accused a narrative response that will enable the court to ascertain whether he has, in fact, understood his rights and is willing to waive them. [Citations.]" (Alcocer, supra, at p. 961, 254 Cal.Rptr. 72.)
Here, the trial court did not follow the procedures outlined in Alcocer. It did not appoint independent counsel to advise Noriega concerning the potential conflict. Nor did it allow the public defender's office an opportunity to explain, in camera, why it had no confidential information concerning Tranand, accordingly, why it had no actual or potential conflict of interest involving Tran. Instead, it applied the per se rule of disqualification based on the mere possibility or appearance that the public defender had a conflict of interest, and notwithstanding Noriega's proffered waiver of any potential conflict of interest. This was an abuse of discretion.
We recognize that, in the event the public defender's office had an actual conflict of interest involving Tran and Tran failed to waive the conflict, the trial court would have had to consider additional options, including the appointment of associate or backup counsel for the limited purpose of cross-examining Tran. (See Alcocer, supra, 206 Cal.App.3d at pp. 962-963, 254 Cal. Rptr. 72.) It appears, however, that in this particular case the appointment of associate counsel for the purpose of cross-examining Tran would have reconciled the conflicting interests of Noriega and Tran and eliminated the conflict. In any event, options less drastic than disqualifying and removing the public defender and Attorney Ashworth were never considered.
"When a conflict arises out of the successive representation of a former and a current client, disqualification turns on whether there is a substantial relationship between the former representation and the current representation." (Baylis, supra, 139 Cal.App.4th at p. 1066, 43 Cal.Rptr.3d 559, italics added, citing People ex rel. Dept. of Corporations v. SpeeDee Oil Change Systems, Inc. (1999) 20 Cal.4th 1135, 1146, 86 Cal.Rptr.2d 816, 980 P.2d 371 and Flatt v. Superior Court (1994) 9 Cal.4th 275, 283, 36 Cal.Rptr.2d 537, 885 P.2d 950.) Here, there was no substantial relationship between the public defender's former representation of Tran and its current representation of Noriega.

(b) Right to Counsel and Effective Assistance Violations

We next consider whether the disqualification and removal of the public defender and Attorney Ashworth violated Noriega's right to counsel under the federal and state Constitutions. We first observe that the removal order did not violate Noriega's right to counsel under the federal Constitution. As discussed, the right to counsel as guaranteed by the Sixth Amendment does not extend to an indigent criminal defendant who requires counsel to be appointed for him. (Gonzalez-Lopez, supra, 126 S.Ct. at p. 2565.) And here, the public defender and Attorney Ashworth were appointed to represent Noriega at public expense. The removal order therefore *176 did not affect Noriega's right to counsel under the federal Constitution.
The removal order did, however, violate Noriega's right to counsel as guaranteed by the state Constitution. As noted, where an indigent criminal defendant has established an attorney-client relationship with his appointed counsel, that relationship is "no less inviolable than if counsel had been retained." (Smith, supra, 68 Cal.2d at p. 562, 68 Cal.Rptr. 1, 440 P.2d 65.) The state Supreme Court has also recognized that "[t]he involuntary removal of an attorney is a severe limitation on a defendant's right to counsel and may be justified, if at all, only in the most flagrant circumstances of attorney misconduct or incompetence when all other judicial controls have failed." (Cannon v. Commission on Judicial Qualifications, supra, 14 Cal.3d at p. 697, 122 Cal.Rptr. 778, 537 P.2d 898, italics added.) Stated another way, Noriega's desire to be represented by Attorney Ashworth could "constitutionally be forced to yield" only if it resulted "in significant prejudice" to Noriega "or in a disruption of the orderly processes of justice unreasonable under the circumstances of [this] particular case." (Crovedi supra, 65 Cal.2d at p. 208, 53 Cal.Rptr. 284, 417 P.2d 868.)
Here there was no showing that any conflict of interest the public defender's office may have had in representing Noriega (based on any confidential information it may have had concerning Tran) could not have been eliminated by appointing associate counsel to cross-examine Tran at Noriega's trial. In this manner, any confidential information the public defender's office may have had concerning Tran would have remained confidential, and Noriega's interest in maintaining his existing attorney-client relationship with Attorney Ashworth would have been preserved. Thus, here, there were no counter-veiling considerations sufficient to override Noriega's state constitutional interest in continuing his attorney-client relationship with Attorney Ashworth. We emphasize that the public defender's potential conflict of interest in this case was minor, and could have been eliminated by appointing associate counsel to cross-examine Tran.
For the same reasons, the trial court exceeded the "substantial latitude" it had under the federal Constitution to eliminate attorney conflicts of interest, whether actual or potential, in order to "ensur[e] that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them." (Wheat, supra, 486 U.S. at pp. 160, 163, 108 S.Ct. 1692, italics added.) This "substantial latitude" to eliminate conflicts is one of several limitations on a defendant's federal constitutional right to counsel of his own choosing. (Id. at p. 159, 108 S.Ct. 1692.) But it is also designed to protect a defendant's correlative right to effective assistance of counsel. (Ibid.)
In Wheat, the high court observed that "the essential aim" of the Sixth Amendment "is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers." (Wheat, supra, 486 U.S. at p. 159, 108 S.Ct. 1692.) But in Gonzalez-Lopez, the high court recognized a distinction between the right to counsel of one's choice, which is guaranteed by the Sixth Amendment, and the right to effective assistance of counsel, which is guaranteed by the due process clause of the Fifth Amendment, not the Sixth Amendment. (Gonzalez-Lopez, supra, 126 S.Ct. at pp. 2562-2563.)
Thus here, the disqualification and removal of the public defender and Attorney Ashworth violated Noriega's state and federal constitutional right to effective assistance of counsel (see Strickland v. Washington, supra, 466 U.S. at p. 686, 104 S.Ct. 2052 and People v. Ledesma, supra, 43 Cal.3d at p. 215, 233 Cal.Rptr. 404, 729 P.2d 839), and his state constitutional right to counsel of his choice, or more specifically, *177 his right to continue being represented by an attorney with whom he had an existing relationship (Smith, supra, 68 Cal.2d at p. 562, 68 Cal.Rptr. 1, 440 P.2d 65). But as noted, the removal order did not violate Noriega's distinctive right to counsel under the federal Constitution.
The relatively minor and remediable potential conflict of interest involved in this case is to be distinguished from cases in which an attorney's conflict of interest is substantial and cannot be eliminated by measures less drastic than disqualifying and removing the attorney. Jones, supra, 33 Cal.4th at pages 240 through 245, 14 Cal.Rptr.3d 579, 91 P.3d 939 involved a substantial and apparently irremediable conflict of interest. There, the trial court ordered the removal of the defendant's appointed attorney over the defendant's objection. The defendant's attorney, Gary Roberts, worked for a law firm that had represented Michael Wert, a person who may have had a motive and an opportunity to commit the same crime, a murder, that defendant was charged with committing. (Id. at pp. 241-242, 14 Cal.Rptr.3d 579, 91 P.3d 939.) Roberts told the trial court that the possibility of a conflict involving Wert was "very troublesome" to him and had the potential of "creating problems." (Id. at p. 242, 14 Cal.Rptr.3d 579, 91 P.3d 939.) Roberts also said that his fear of being sued by Wert might affect his representation of the defendant. (Ibid.)
In view of Roberts's "serious potential conflict of interest," the Jones court held that the trial court acted within the "substantial latitude" it had under the federal Constitution to eliminate the potential conflict by removing Roberts. (Jones, supra, 33 Cal.4th at pp. 241-242, 14 Cal.Rptr.3d 579, 91 P.3d 939.) Here, in contrast, the public defender's office did not have a serious potential conflict of interest involving Tran, and any conflict it did have could have been eliminated without removing the entire public defender's office and Attorney Ashworth. (See also Baylis, supra, 139 Cal.App.4th at p. 1071, 43 Cal.Rptr.3d 559 [criminal defendant's right to counsel of his choice "may be forced to yield in order to enforce the duty of confidentiality where the former client is a codefendant].)
The court in Jones also concluded that the removal of Roberts did not violate the defendant's right to counsel under the state Constitution, because the trial court was seeking to protect the defendant's right to competent counsel, or his right to effective assistance of counsel. (Jones, supra, 33 Cal.4th at pp. 244-245, 14 Cal. Rptr.3d 579, 91 P.3d 939.) The court explained that, "when, as here, a trial court removes a defense attorney because of a potential conflict of interest, the court is seeking to protect the defendant's right to competent counsel. In such circumstances, there is no violation of the right to counsel guaranteed by article I, section 15 of the state Constitution, notwithstanding the defendant's willingness to waive the potential conflict." (Id. at pp. 244-245, 14 Cal.Rptr.3d 579, 91 P.3d 939.)
As we have observed, the right to effective assistance of counsel is distinct from the federal constitutional right to counsel of choice (Gonzalez-Lopez, supra, 126 S.Ct. at pp. 2562-2563), and is protected by both the federal and state Constitutions (see Strickland, v. Washington, supra, 466 U.S. at p. 686, 104 S.Ct. 2052 and People v. Ledesma, supra, 43 Cal.3d at p. 215, 233 Cal.Rptr. 404, 729 P.2d 839). Just as there is a distinction between the right to counsel of choice and the right to effective assistance of counsel under the federal Constitution, a like distinction should be made between the right to counsel of choice (including the right of an indigent defendant to continue being represented by appointed counsel with whom he has an *178 existing attorney-client relationship) and the right to effective assistance of counsel under the state Constitution.[13]

(c) The Error is Reversible Per Se

The last question we must address is whether the erroneous removal of the public defender and Attorney Ashworth renders the judgment against Noriega reversible per se. Noriega argues the error is reversible per se because it deprived him of his state constitutional right to counsel of his choice, that is, his existing attorney-client relationship with Attorney
Ashworth. The People argue that Noriega must show the removal order prejudiced hinv and reversal is not required because he has not attempted to show prejudice. Alternatively, the People argue that Noriega waived or acquiesced in the removal order because he failed to challenge it by pretrial writ petition.
In support of his argument that the state constitutional error renders the judgment reversible per se, Noriega relies on Gonzalez-Lopez, supra, 126 S.Ct. 2557 and People v. Burrows (1990) 220 Cal.App.3d *179 116, 269 Cal.Rptr. 206. These cases involved the erroneous deprivation of a nonindigent defendant's right to counsel of his choice, and the courts in both cases held that the error was reversible per se. (Gonzalez-Lopez, supra, at p. 2562; People v. Burrows, supra, at p. 125, 269 Cal. Rptr. 206, see also People v. Courts (1985) 37 Cal.3d 784, 797, 210 Cal.Rptr. 193, 693 P.2d 778 [same holding].) In contrast to the defendants in these cases, Noriega is an indigent defendant who required counsel to be appointed for him. As will appear, however, this is a distinction without a difference.
In Gonzalez-Lopez, the high court held that the violation of the defendant's Sixth Amendment right to counsel of his choice constituted structural error and was therefore reversible per se. (Gonzalez-Lopez, supra, 126 S.Ct. at pp. 2561-2565.) The court reasoned that the "right to select counsel of one's choice ... has never been derived from the Sixth Amendment's purpose of ensuring a fair trial" or the right to effective counsel. (Id. at pp. 2562-2563, fn. omitted, italics added.) "It has [instead] been regarded as the root meaning of the constitutional guarantee." (Id. at p. 2563.) Accordingly, the violation is "complete" when it is shown that "the deprivation of counsel was erroneous," and no additional showing of prejudice is required. (Id. at p. 2562.) The violation defies harmless error analysis, because its "consequences ... are necessarily unquantifiable and indeterminate?' (Id. at p. 2564.)
In contrast, the court in Gonzalez-Lopez noted that the violation of a defendant's distinctive right to competent or effective assistance generally requires the defendant to make a showing of prejudice. (Gonzalez-Lopez, supra, 126 S.Ct. at p. 2562.) This requirement derives from the basis of the right itselfthe right to a fair trial. Thus, a violation of the right to effective representation is not "complete" until the defendant is prejudiced. (Id, at p. 2563.) The right to counsel, in contrast, is not based on the right to a fair trial, and thus does not require a showing of prejudice.
The rationale applied in Gonzalez-Lopez applies with equal force to the present case. Just as the defendant in Gonzalez-Lopez was deprived of his federal constitutional right to counsel of his choice, Noriega was deprived of his state constitutional right to counsel of his choice when the trial court ordered the removal of the entire public defender's office and Attorney Ashworth, over Noriega's objection and without a showing that continuing the representation would have resulted in a "disruption of the orderly processes of justice unreasonable under the circumstances of the particular case." (Crovedi, supra, 65 Cal.2d at p. 208, 53 Cal.Rptr. 284, 417 P.2d 868.) The right to counsel of choice is separate and distinct from the right to competent or effective assistance of counsel, whether the right arises under the federal or state Constitutions.
We recognize that, many years before Gonzalez-Lopez was decided in June 2006, the court in People v. Chavez (1980) 26 Cal.3d 334, 338, 344 through 349, 161 Cal. Rptr. 762, 605 P.2d 401 (Chavez) rejected the reversal per se rule in a case involving the erroneous failure to appoint an indigent defendant's counsel of his choice. The court instead held that a showing of prejudice was required. (See also People v. Pompa-Ortiz (1980) 27 Cal.3d 519, 529, 165 Cal.Rptr. 851, 612 P.2d 941 [limiting right to relief for nonjurisdictional irregularities in preliminary examination procedures to pretrial challenges by writ petition; relief after judgment available only upon showing of prejudice].) The reasoning of Chavez has been implicitly disapproved by the high court's adoption of the *180 reversal per se rule in Gonzalez-Lopez, however.
We also recognize that, in People v. Phillips (1985) 169 Cal.App.3d 632, 636 through 640, 215 Cal.Rptr. 394 (Phillips), Division Three of this court followed Chavez in holding that the erroneous removal of an indigent defendant's court-appointed counsel during the defendant's first trial, in which a mistrial was declared, was not reversible per se. The court in Phillips emphasized that the defendant acquiesced in the error because he did not object to the removal. He also did hot claim that his second court-appointed attorney was inadequate or ineffective in any way in representing him at his second trial.
The court in Phillips also emphasized that the defendant did not seek to correct the error by petitioning for an extraordinary writ before his second trial. (Phillips, supra, 169 Cal.App.3d at p. 639, 215 Cal.Rptr. 394.) Under these circumstances, the court said it could not condone giving the defendant a "`free'" trial. (Ibid.) The matter was analogous, the court said, to the general rule "requiring criminal defendants to properly object to preserve appellate review: To hold otherwise "would "permit the defendant to gamble on an acquittal at his trial secure in the knowledge that a conviction would be reversed on appeal...."' [Citation.]" (Ibid.)
Here, in contrast to Phillips, Noriega objected to the disqualification and removal of the public defender and Attorney Ashworth. And, although Noriega did not seek their reinstatement either at the trial court level or by extraordinary writ in the appellate-court, under the circumstances of this case he should be excused from i doing so. Supervising Deputy Public Defender De Prisco told the trial court that the public defender's office was going to seek a writ, but it never did so. Moreover, it was unclear whether the public defender's office or Attorney Morreale, who was later appointed to represent Noriega, had a duty to' seek writ review of the removal order. After the public defender's office was removed, no one was charged with the responsibility of seeking the writ on Noriega's behalf.
Accordingly, the erroneous deprivation of Noriega's state constitutional right to counsel of his choice renders the judgment against him reversible per se. Our conclusion is consistent with the holding in Gonzalez-Lopez, that the erroneous deprivation of a defendant's federal constitutional right to counsel of his choice is reversible per se (Gonzalez-Lopez, supra, 126 S.Ct. at pp. 2561-2565) and with California decisions which have long recognized that, under the state Constitution, a defendant's right to counsel of choice includes the right of an indigent defendant to be the "master of his own fate" and continue his existing relationship with his court-appointed counsel (Smith, supra, 68 Cal.2d at p. 562, 68 Cal.Rptr. 1, 440 P.2d 65; Alcocer, supra, 206 Cal.App.3d at p. 957, 254 Cal.Rptr. 72).
We recognize that reversing the judgment against Noriega affords him a "free trial," and that this is a harsh result for the People. Indeed, we agree with the dissent that a defendant should not be allowed to "whipsaw" a trial court by asserting error on appeal no matter which way the trial court ruled on a motion to disqualify the defendant's counsel. (Wheat, supra, 486 U.S. at p. 161, 108 S.Ct. 1692; Phillips, supra, 169 Cal. App.3d at p. 639, 215 Cal.Rptr. 394.) But Noriega would have no right to challenge the trial court's removal order on this appeal had the trial court obtained Noriega's knowing and intelligent waiver of his state constitutional right to counsel of his choice. Alternatively, in the event Noriega refused to waive his right to counsel of his choice, the trial court should have appointed independent *181 counsel for the purpose of seeking writ review of the removal order on Noriega's behalf.
We believe that, in future cases, these measures should be added to the list of "general guidelines" that trial courts should follow when confronted with a potential conflict, as outlined by the court in Alcocer, supra, 206 Cal.App.3d at pages 961 through 963, 254 Cal.Rptr. 72. When a trial court removes counsel of a criminal defendant's choice, it should make sure that the defendant either seeks writ review of the removal order or knowingly and intelligently waives his right to counsel and, concomitantly, his right to seek writ review. In the present case, these additional procedures would have protected Noriega's state constitutional right to counsel of his choice, while preventing him from having a "free trial" at the expense of the People. Indeed, the preservation of an indigent criminal defendant's state constitutional right to counsel demands that courts follow these procedures particularly where, as here, there was no overriding justification for removing Noriega's appointed counsel.
We disagree with the dissent's view that an indigent criminal defendant must demonstrate prejudice in order to successfully challenge an order removing the defendant's appointed counsel on appeal. The high court in Gonzalez-Lopez held that a nonindigent criminal defendant is not required to show prejudice when his federal constitutional right to counsel of choice is violated. (Gonzalez-Lopez, supra, 126 S.Ct. at p. 2562.) Instead, the violation of the right to counsel is "complete" when the defendant's counsel is removed without one or more overriding justifications. (Ibid.) It necessarily follows that a violation of an indigent criminal defendant's state constitutional right to counsel of his choice is also complete when his appointed counsel is removed without one or more overriding justifications. (See Smith, supra, 68 Cal.2d at p. 562, 68 Cal.Rptr. 1, 440 P.2d 65.)
Furthermore, cases holding that an indigent defendant must show prejudice in claiming a violation of the right to counsel of his choice (e.g., Chavez, supra, 26 Cal.3d "334, 161 Cal.Rptr. 762, 605 P.2d 401) were decided before the Gonzalez-Lopez court distinguished the right to counsel of choice from the right to effective assistance of counsel. A violation of the right to effective assistance requires a showing of prejudice, because that right is based on the defendant's due process right to a fair trial. In contrast, a violation of the right to counsel of one's choice is not based on the due process right to a fair trial, but on the right to be defended by the counsel the defendant believes to be best. Thus, a violation of the right to counsel defies harmless error analysis; its consequences are "necessarily unquantifiable and indeterminate." (Gonzalez-Lopez, supra, 126 S.Ct. at pp. 2562-2564.) Likewise, a violation of an indigent criminal defendant's state constitutional right to counsel defies harmless error analysis and requires no showing of prejudice.

IV. DISPOSITION
The judgment against Paredes is affirmed. The judgment against Noriega is reversed.
I concur: GAUT, Acting P.J.
MILLER, J., concurring and dissenting.
I agree with the majority's opinion in several respects. First, I concur with the unpublished parts of the majority's opinion. With respect to the published part of the opinion, I fall in with the majority's finding that the trial court abused its discretion when it relieved Deputy Public Defender *182 James Ashworth (Ashworth) as Noriega's attorney without complying with the procedures enumerated in Alcocer v. Superior Court (1988) 206 Cal.App.3d 951, 254 Cal.Rptr. 72 (Alcocer). I also concur in the majority's determination that the removal order did not violate Noriega's Sixth Amendment right to counsel under the federal constitution but did violate Article I, section 15 of our state constitution.
Where I part company with the majority is (1) the standard of review should be applied, and (2) the remedy to be applied. Rather than the reversible per se standard employed, I believe that the defendant must show prejudice.
Secondly, the current state of the law allows a defendant to "roll the dice" and gamble to see if he is convicted. Should he be found guilty, he still has the option to raise the "right to choice of counsel" issue on appeal. I vociferously disagree with allowing the "choice of counsel" issue to be an appealable one. This allows a defendant to exploit gamesmanship tactics to whipsaw a trial court by "asserting] error no matter which way [it] rule[s]" (Wheat v. United States (1988) 486 U.S. 153, 161, 108 S.Ct. 1692, 100 L.Ed.2d 140 (Wheat)) and gives a defendant a "free trial" should a trial court "guess wrong" and obtain a reversal on appeal. (People v. Phillips (1985) 169 Cal.App.3d 632, 639, 215 Cal.Rptr. 394 (Phillips).) I believe that any time a defendant complains that his choice of counsel has been erroneously denied, the proper procedural mechanism should be a writ petition seeking reinstatement of his counsel of choice, at the time the removal is ordered, rather than to wait and allow the matter to be addressed on appeal.

A. Prejudice versus Reversible Per Se.
The majority cites United States v. Gonzalez-Lopez (2006) 548 U.S. 140, 126 S.Ct. 2557, 2561, 165 L.Ed.2d 409 (Gonzalez-Lopez ) for the proposition that the violation of the defendant's right to counsel of choice constituted structural error and is therefore reversible per se. (Maj. Opn. at p. 179.) Gonzalez-Lopez makes it clear that the reversible per se standard only applies in cases where defense counsel is retained and not appointed. The very language of Gonzalez-Lopez says that the right to counsel of choice does not apply to appointed counsel: "We have previously held that an element of this [Sixth Amendment right to counsel] is the right of a defendant who does not require appointed counsel to choose who will represent him." (Gonzalez-Lopez, supra, 126 S.Ct. at p. 2561, citing, Wheat, supra, 486 U.S. at p. 159,108 S.Ct. 1692, italics added.)
"Nothing we have said today casts any doubt or places any qualification upon our previous holdings that limit the right to counsel of choice and recognize the authority of trial courts to establish criteria for admitting lawyers to argue before them. As the dissent too discusses, [citation], the right to counsel of choice does not extend to defendants who require counsel to be appointed for them. [Citations.] Nor may a defendant insist on representation by a person who is not a member of the bar, or demand that a court honor his waiver of conflict-free representation. [Citation.] ... None of these limitations on the right to choose one's counsel is relevant here." (Gonzalez-Lopez, supra, 126 S.Ct. at pp. 2565-2566, italics added.)
The reason that an indigent defendant's right to counsel of choice was not relevant in Gonzalez-Lopez was because the petitioner's attorney was retained. Gonzalez-Lopez's admonition that a defendant is entitled to retained counsel of choice is not *183 applicable in this situation in that Ashworth was appointed by the trial court.
The majority opinion also states that Gonzalez-Lopez implicitly disapproved the prejudice standard in People v. Chavez (1980) 26 Cal.3d 334, 161 Cal.Rptr. 762, 605 P.2d 401 (Chavez) and held that denying defendant his right to "choice of counsel" is structural error that requires reversal per se. [Maj. Opn. at p. 179.] However, the California Supreme Court recently reiterated that reversal is automatic when a defendant has been deprived of his right to defend with retained counsel of his choice. (People v. Ramirez (2006) 39 Cal.4th 398, 423, 46 Cal.Rptr.3d 677, 139 P.3d 64 (Ramirez ), citing People v. Ortiz (1990) 51 Cal.3d 975, 988, 275 Cal.Rptr. 191, 800 P.2d 547 (Ortiz).) In Ramirez, the Supreme Court cautioned trial courts to exercise caution if they prevent defendants from dismissing their retained counsel because a criminal defendant has a constitutional right to defend with his counsel of choice. (Ramirez, at p. 423, 46 Cal. Rptr.3d 677, 139 P.3d 64.) Violating that right denies defendant a right to a fair trial and the conviction is automatically reversed without defendant having to prove prejudice. (Ibid.) Both Ramirez and Ortiz deal with retained counsel; in Ramirez, the conviction was affirmed because defendant was properly allowed to select his co-counsels of choice (Id, at pp. 424-425, 46 Cal.Rptr.3d 677, 139 P.3d 64) and in Ortiz, a defendant who could no longer afford his retained counsel after a mistrial was entitled to discharge his attorney and request a public defender. (Ortiz, at p. 985, 275 Cal.Rptr. 191, 800 P.2d 547.)
There is nothing within the recent cases of Ramirez and Gonzalez-Lopez that changes the application of the prejudice standard of review elucidated in Chavez, supra, 26 Cal.3d 334, 161 Cal.Rptr. 762, 605 P.2d 401 [appointing new counsel for indigent defendant at the superior court level], Phillips, supra, 169 Cal.App.3d at p. 640, 215 Cal.Rptr. 394 [substituting public defender with court appointed attorney], and People v. Ward (1972) 27 Cal.App.3d 218, 234, 103 Cal.Rptr. 671 [court erroneously reappointed public defender who completed first trial when retained counsel was unavailable for retrial]. In all three cases, reviewing courts applied the prejudice standard of review. Consequently, without defendant having shown that the appointment of conflict defense panel attorney Mr. Morreale prejudiced him, I would find that defendant is not entitled to reversal of the judgment of conviction. (Cf. People v. Courts (1985) 37 Cal.3d 784, 796, 210 Cal.Rptr. 193, 693 P.2d 778; People v. Crovedi (1966) 65 Cal.2d 199, 53 Cal.Rptr. 284, 417 P.2d 868; Alcocer, supra, 206 Cal.App.3d at p. 957, 254 Cal. Rptr. 72; Ortiz, supra, 51 Cal.3d 975, 275 Cal.Rptr. 191, 800 P.2d 547 [instances where a defendant did not have to prove prejudice because disallowing a nonindigent defendant the right to maintain or discharge retained counsel of choice was reversible per se].)

B. Timely Writ Relief Should Have Been Pursued as the Appellate Remedy is Inadequate.
The essence of defendant's complaint is that he wanted Ashworth to be his attorney at trial, as he had an established bond and simpatico working relationship with him. However, by attaining a reversal of his conviction, defendant does not gain his remedy of choice: Ashworth is no longer employed with the Riverside County Public Defender's Office.[1]
*184 It is true that California case law has provided defendant two modes of enforcing the right to counsel of choice. One way is to petition a reviewing court to seek readdress when a trial court denies defendant his sought-after counsel. This method is exemplified in cases where defendants sought writ relief (see, e.g., Maxwell v. Superior Court (1982) 30 Cal.3d 606, 180 Cal.Rptr. 177, 639 P.2d 248; Alcocer, supra, 206 Cal.App.3d 951, 254 Cal.Rptr. 72; Boulas v. Superior Court (1986) 188 Cal. App.3d 422, 233 Cal.Rptr. 487; Harris v. Superior Court (1977) 19 Cal.3d 786, 140 Cal.Rptr. 318, 567 P.2d 750).
On the other hand, the denial of choice of counsel has been reviewed on appeal in People v. Jones (2004) 33 Cal.4th 234, 14 Cal.Rptr.3d 579, 91 P.3d 939; Ramirez, supra, 39 Cal.4th 398, 46 Cal.Rptr.3d 677, 139 P.3d 64; People v. Crovedi, supra, 65 Cal.2d 199, 53 Cal.Rptr. 284, 417 P.2d 868; Ortiz, supra, 51 Cal.3d 975, 275 Cal.Rptr. 191, 800 P.2d 547; Phillips, supra, 169 Cal.App.3d 632, 215 Cal.Rptr. 394.
The very touchstone of a writ petition is that an appellate remedy is inadequate. (Conway v. Municipal Court (1980) 107 Cal.App.3d 1009, 1016, 166 Cal.Rptr. 246.) In this instance, defendant should have filed a petition for writ of mandate/prohibition with this court, seeking to vacate the trial court's removal order at the time it was made. (Phillips, supra, 169 Cal. App.3d at p. 639, 215 Cal.Rptr. 394.) We cannot rearrange the past. The only way for defendant to have obtained Ashworth as his counsel of choice was for him to have filed a writ petition.
This would be similarly true in, other cases where attorneys would be unavailable, such as when an attorney is ill, dies, retires, or moves out of state. It is incumbent upon defendants, who truly want to obtain their counsel of choice, to timely petition a reviewing court via a writ to obtain an adequate remedycounsel of choiceand not merely use the loss of their preferred counsel as a rubric to obtain a reversal of their conviction. Criminal trials are a search for truth and not a game. (In re Misener (1985) 38 Cal.3d 543, 551, 213 Cal.Rptr. 569, 698 P.2d 637; In re Ferguson (1971) 5 Cal.3d 525, 531, 96 Cal.Rptr. 594, 487 P.2d 1234.)
For three years, defendant never complained to anyone regarding Mr. Morreale's work. Defendant should not now be able to complain that he should have had Ashworth as his attorney, when he had the opportunity to file a writ petition to request Ashworth's reinstatement. Defendant never asked Mr. Morreale to file a writ petition asking for Ashworth to be reinstated as his attorney. A defendant should not be able to gamble on appeal that he will obtain a reversal should a reviewing court find he was denied his counsel of choice.
While the majority states it was unclear whether the public defender or newly appointed counsel should have brought a writ, it is clear that it was incumbent upon the new attorney to file the writ once he was appointed as attorney of record. If the public defender had wanted to file the writ petition in order to keep defendant as a client, the public defender could have requested the trial court to stay its removal order while his office sought writ relief.
I would affirm the judgment.
NOTES
[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.110.1, this opinion is certified for publication with the exception of section III., parts A, B, and C.
[1] All further statutory references are to the Penal Code unless otherwise indicated.
[2] Judge Christian F. Thierbach presided over the trial of both defendants. Before trial, Judge Dennis A. McConaghy disqualified and ordered the removal of Noriega's court-appointed counsel, the Riverside County Public Defender's Office and Deputy Public Defender James Ashworth.
[3] At the time, Vasquez and Paredes referred to each other as cousins, although they were not related and had known each other only four or five months.
[4] Miranda v. Arizona (1966) 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (Miranda).
[5] The prosecutor conceded, and the trial court ruled, that Borja violated Noriega's Miranda rights by continuing the interview after Noriega repeatedly stated he no longer wanted to talk. Accordingly, the red jury only heard the statements that Noriega made to Borja before Noriega invoked his Miranda rights.
[**] See footnote *, ante.
[7] On March 19, 2002, the date of the scheduled preliminary hearing, the People moved to relieve the public defender and appoint a member of the conflict panel to represent Noriega. The motion was granted but was "later vacated after Noriega indicated he wanted to go forward with the preliminary hearing. The record does not include transcripts of these proceedings, and the minute orders do not indicate the grounds for the motion nor the court's reasons for granting it.
[8] On the day of the transport bus incident, Tran pleaded guilty to charges unrelated to the case against Noriega, Paredes, and Vasquez. Tran was sentenced to prison in October 2002.
[9] In Smith, the trial court summarily dismissed the defendant's appointed counsel, with whom the defendant had an established attorney-client relationship, based on its belief that counsel was "incompetent" to represent the defendant. The Smith court held that the trial court exceeded its inherent and statutory authority in ordering the attorney's removal, and that its order also constituted "`an unreasonable interference'" with the defendant's constitutional right to counsel. (Smith, supra, 68 Cal.2d. at pp. 561-562, 68 Cal.Rptr. 1, 440 P.2d 65.)
[10] A trial court's power to disqualify an attorney based on an actual or potential conflict of interest derives from Code of Civil Procedure section 128, subdivision (a)(5). (Jones, supra, 33 Cal.4th at p. 244, fn. 2, 14 Cal.Rptr.3d 579, 91 P.3d 939.) The statute applies in criminal cases (ibid), and authorizes a trial court to "`control in furtherance of justice, the conduct of its ministerial officers, and of all other persons in any manner connected with a judicial proceeding before it....'" (Ibid.)
[11] Cf. People v. Baylis (2006) 139 Cal.App.4th 1054, 1071, 43 Cal.Rptr.3d 559 (Baylis) (trial court did not abuse its discretion in refusing to accept the defendant's proffered waiver of his attorney's conflict of interest, because the conflict was substantial and implicated the attorney's duty of confidentiality to a former client).
[12] The order disqualifying and removing the public defender and Attorney Ashworth was issued in December 2002, long before this court's decision in Rhaburn was issued in June 2006. Nevertheless, Rhaburn is retroactive and binding on the trial court in this matter. (Auto Equity Sales, Inc. v. Superior Court (1962) 57 Cal.2d 450, 455, 20 Cal.Rptr. 321, 369 P.2d 937 [lower courts are required to follow decisions of higher courts] and Newman v. Emerson Radio Corp. (1989) 48 Cal.3d 973, 978, 258 Cal.Rptr. 592, 772 P.2d 1059 [judicial decisions are generally given retroactive effect].)
[13] Justice Werdegar touched on this distinction in her concurring opinion in Jones. She pointed out that, on the federal constitutional question, Wheat did not involve the removal of an attorney with whom the defendant had an established attorney-client relationship. (Jones, supra, 33 Cal.4th at p. 248, 14 Cal. Rptr.3d 579, 91 P.3d 939 (cone. opn. of Werdegar, J.).) Accordingly, Justice Werdegar wrote, "Wheat does not address whether [the substantial latitude] rule applies where, as here, a defendant has an already established attorney-client relationship' with his lawyer. The distinction is important; as we said in Maxwell v. Superior Court[, supra,] 30 Cal.3d [at p. 613, 180 Cal.Rptr. 177, 639 P.2d 248], `[E]ffective assistance is linked closely to representation by counsel of choice. When clients and lawyers lack rapport and mutual confidence the quality of representation may be so undermined as to render it an empty formality.' By terminating the existing attorney-client relationship over defendant's objection, the trial court's decision here risked destroying the trust and confidence that had developed between Roberts and defendant over almost two years.'' (Jones, supra, at p. 248, 14 Cal.Rptr.3d 579, 91 P.3d 939 (cone, opn. of Werdegar, J.).)

Nevertheless, Justice Werdegar, joined by Justice Mofeno, agreed there was no violation of the defendant's federal constitutional right to counsel in view of the "serious possibility that Roberts's conflict would undermine the fairness of the trial." (Jones, supra, 33 Cal.4th at pp. 249-250, 14 Cal.Rptr.3d 579, 91 P.3d 939 (cone. opn. of Werdegar, J.).) In reaching this conclusion, Justice Werdegar wrote, "As Wheat recognizes, when the right to preferred counsel under the Sixth Amendment collides with the right to the effective assistance of counsel, also guaranteed by the Sixth Amendment, an accommodation must occur. In such cases, a court `must recognize [the] presumption in favor of [defendant's] counsel of choice ... may be overcome not only by a demonstration of actual conflict but by a showing of a serious potential for conflict.' (Wheat, supra, 486 U.S. at p. 164[, 108 S.Ct. 1692], italics added.)" (Id. at p. 
249, 14 Cal.Rptr.3d 579, 91 P.3d 939 (cone. opn. of Werdegar, J.).)
On the state constitutional question, Justice Werdegar observed that California decisions had "for years treated conflict of counsel issues differently under the California Constitution than under the federal Constitution, recognizing that the state charter grants criminal defendants greater rights both to challenge and to waive conflicts of counsel than does its federal counterpart." (Jones, supra, 33 Cal.4th at p. 250-251, 14 Cal.Rptr.3d 579, 91 P.3d 939 (cone. opn. of Werdegar, J.).) In sum, Justice Werdegar noted that California decisions recognized that "`a defendant is master of his own fate,'" (id. at p. 251, 14 Cal.Rptr.3d 579, 91 P.3d 939, citing Alcocer, supra, 206 Cal.App.3d at p. 957, 254 Cal.Rptr. 72) and a defendant's "`desire to defend himself in whatever manner he deems best ... can constitutionally be forced to yield only when it will result in significant prejudice to the defendant himself or in a disruption of the orderly processes of justice unreasonable under the circumstances of the particular case.'" (Jones, supra, at pp. 251-252, 14 Cal.Rptr.3d 579, 91 P.3d 939 (cone. opn. of Werdegar, J.), citing Crovedi, supra, 65 Cal.2d at p. 208, 53 Cal.Rptr. 284, 417 P.2d 868.)
[1] Pursuant to Evidence Code section 459, we take judicial notice that Ashworth is no longer affiliated with the Riverside County Office of the Public Defender. http://members.calbar.ca.gov/search/memberdetail.aspx?x=109168